494 S.E.2d 115

**The STATE, Respondent,**

v.

**James Joseph LEWIS, Jr., Appellant.**

**No. 24720.**

Supreme Court of South Carolina.

Heard Oct. 7, 1997.

Decided Dec. 8, 1997.

Deputy Chief Attorney Joseph L. Savitz, III, of South Carolina Office of Appellate Defense, Columbia, for appellant.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Senior Assistant Attorney General Norman Mark Rapoport, Columbia; and Ralph J. Wilson, Conway, for respondent.

BURNETT, Justice:

On November 2, 1995, appellant broke into his estranged wife's home and shot her paramour at close range, killing him. Appellant was indicted on murder and first degree burglary charges. He was convicted of voluntary manslaughter and first degree burglary, but found mentally ill.

Appellant argues the trial judge erred by failing to instruct the jury on insanity. He contends his own testimony and that of lay witnesses supported an instruction on insanity. We disagree.

## *ISSUE*

Did the trial judge err by refusing appellant's request to instruct the jury on insanity?

## *FACTS*

Appellant testified he and Charlotte began living together in March 1991 and married in March 1993. Throughout the marriage, appellant was suspicious of Charlotte's relationships with other men. Appellant and Charlotte separated in June 1995. Charlotte moved into her own residence. After their separation, appellant learned some of Charlotte's relationships had been adulterous.

Appellant testified between the separation and the shooting, he lost 70 pounds, had difficulty sleeping, saw a "nerve specialist," and contemplated suicide. Appellant testified he did not remember going to work two days before the shooting. The day before the shooting, appellant saw a psychiatrist who prescribed medication.

The morning of the shooting, appellant testified he awoke and felt at peace because he had decided to visit Charlotte and then take his own life. Appellant remembered telephoning Charlotte and telling her he was going to shoot himself on her front porch. Appellant explained he sat on Charlotte's front porch with the gun in his mouth waiting for someone to look out the window, but no one did. Appellant testified the next thing he remembered was the gun going off. He realized he had shot Sammy, who was laying half-dressed in Charlotte's bed. Appellant maintained he did not intend to harm anyone other than himself.[1]

After the shooting, appellant admitted following Charlotte out of her residence with the gun in his hand, but after seeing two police officers with their guns drawn, he turned around and went back into the home. Appellant allowed emergency personnel into the residence to remove Sammy.[2] Appellant stated he remained in the home with a gun to his head and shot himself when the SWAT team threw in tear gas because he "thought they may be able to take me out alive." [3]

On cross-examination, appellant testified he "wasn't in [his] right mind that morning;" "I didn't do anything logical that day." He testified he must have been "totally out of [his] mind."

A neighbor testified she saw appellant the evening before the shooting. He was slumped in a chair and was acting differently; he did not hear anything she was saying; he cried; he was "completely out of it;" he was "severely disturbed." The neighbor testified she thought appellant was going to kill himself. Another neighbor testified she never saw appellant lose his temper.

---

1. Appellant neither admitted nor denied knowing Sammy was inside Charlotte's home, however, Charlotte testified she told appellant over the telephone Sammy was there and "[they] were still in bed."

2. Charlotte testified she heard Sammy breathing before she fled from her home. The forensic pathologist testified Sammy died several hours after the shooting.

3. Police negotiated with appellant for seven hours before the SWAT team entered the home.

Appellant's employee testified months prior to the shooting, appellant quit coming to work on a regular basis and was dazed and depressed.

Appellant's sister, who resided in Maryland, testified weeks prior to the shooting, appellant would telephone and, when she answered, he would be crying and incoherent. She testified she visited appellant a few days before the shooting because she was concerned he would kill himself. The sister testified appellant was not a violent person.

Appellant's daughter testified she was very worried about appellant after he and Charlotte separated. Appellant would telephone her and cry, and spend hours talking about how he missed Charlotte. On the day of the shooting, appellant telephoned his daughter at 6:00 a.m.; she thought he was going to kill himself.

Both the prosecution and defense medical experts testified appellant suffered from severe depression, a mental illness, at the time of the commission of the crimes, but concluded appellant was able to distinguish between right and wrong. Appellant's expert testified, because of his severe depression, appellant was unable to conform his conduct to the requirements of the law.[4]

## DISCUSSION

■■■ In every criminal case, it is presumed the defendant is sane. *State v. Milian–Hernandez,* 287 S.C. 183, 336 S.E.2d 476 (1985). Insanity is an affirmative defense to a prosecution for a crime. *Id.*

■■■ South Carolina has adopted the M'Naghten test to determine insanity.[5] A defendant is insane if, at the time of the commission of the act constituting the offense, as a result

---

4. This testimony alone supported the charge on guilty but mentally ill (GBMI). A defendant is GBMI, "if, at the time of the commission of the act constituting the offense, he had the capacity to distinguish right from wrong or to recognize his act as being wrong ... but because of mental disease or defect he lacked sufficient capacity to conform his conduct to the requirements of the law." S.C.Code § 17–24–20(A) (Supp.1996).

5. *M'Naghten's Case,* 8 Eng.Rep. 718 (1843).

of mental disease or defect, he lacked the capacity to distinguish moral or legal right from moral or legal wrong or to recognize the particular act charged as morally or legally wrong. S.C.Code Ann. § 17–24–10(A) (Supp.1996). "[T]he key to insanity is 'the power of the defendant to distinguish right from wrong in the act itself—to recognize the act complained of is either morally or legally wrong'." *State v. Wilson* 306 S.C. 498, 506, 413 S.E.2d 19, 23, *cert. denied,* 506 U.S. 846, 113 S.Ct. 137, 121 L.Ed.2d 90 (1992), *quoting State v. McIntosh,* 39 S.C. 97, 17 S.E. 446 (1893).

A defendant may rely on lay testimony to establish insanity. *State v. Hinson,* 253 S.C. 607, 172 S.E.2d 548 (1970); *see also, State v. Rimert,* 315 S.C. 527, 446 S.E.2d 400, *cert. denied,* 513 U.S. 1080, 115 S.Ct. 730, 130 L.Ed.2d 634 (1995) (State relied on lay testimony to establish sanity); *State v. Smith,* 298 S.C. 205, 379 S.E.2d 287 (1989) (where defendant presents expert testimony on his insanity, State is not required to present expert testimony on sanity; lay testimony may be sufficient). In fact, a jury may disregard expert testimony. *Milian–Hernandez, supra.*

The law to be charged is determined from the facts presented at trial. *State v. Todd,* 290 S.C. 212, 349 S.E.2d 339 (1986). A requested charge on insanity is properly refused where there is no evidence tending to show the defendant was insane at the time of the crime charged. 23A C.J.S. *Criminal Law* § 1321 (1989).

Appellant contends his own testimony and the testimony of lay witnesses established he could not distinguish between right and wrong or recognize his acts as wrong at the time of the shooting. Appellant relies on his characterization of his mental condition as "out of [his] mind" at the time of the offense and other witnesses' descriptions of his mental state near the time of the offense.

After carefully reviewing the evidence presented, we conclude appellant was not entitled to a charge on insanity. While it is uncontroverted appellant suffered from severe depression, the evidence does not suggest he was unable to distinguish between right and wrong or unable to recognize his actions as morally or legally wrong at the time of the

offense. Even appellant's own testimony that he was "out of [his] mind" does not indicate he could not differentiate between right and wrong or recognize his conduct as wrong.[6] We note "there are but few instances where one slays another while his mind is in normal condition." *State v. Gardner*, 219 S.C. 97, 107, 64 S.E.2d 130, 135 (1951), *citing Anderson v. State*, 67 Tex.Crim. 320, 148 S.W. 802 (1912).

Moreover, appellant's own testimony suggests he was sane. After killing Sammy, appellant testified he chased Charlotte out of her home then ran back inside when he saw police officers with their guns drawn. He allowed an emergency crew into the home to remove Sammy, who was still alive. Thereafter, appellant remained in Charlotte's residence for hours, threatening to shoot himself but not doing so until the SWAT team entered. These actions suggest appellant recognized the gravity of the situation and that his conduct was wrong, and tend to establish his sanity rather than his insanity. *Id.* at 106, 64 S.E.2d at 135 (defendant not entitled to insanity charge even though police testified, shortly after the homicide, defendant "didn't act clear" and "looked like a madman," but stated he was "ready to be electrocuted;" the statement showed the defendant "fully appreciated the gravity of his act.").

---

**6.** *See Brodka v. State*, 53 Ala.App. 125, 298 So.2d 55 (1974) (evidence was insufficient to sustain plea of insanity and court was justified in instructing jury to that effect despite defendant's testimony he was depressed, upset, "something just came over him," and he "didn't know what he was doing at the time of the shooting"); *McClendon v. State*, 157 Ga.App. 435, 278 S.E.2d 96 (1981) (testimony that just prior to assault defendant was "going crazy," was not evidence defendant did not have mental capacity to distinguish between right and wrong); *State v. Roy*, 40 N.M. 397, 60 P.2d 646 (1936) (evidence defendant was "polluted half the time or crazy or something" after the death of his wife, cried, "wasn't himself," and on the day of the homicide "looked kind of wild in his eyes ... just looked something out of the ordinary; figgety [sic], like" did not show at time of crime defendant was not able to distinguish right from wrong); *State v. Davis*, 77 N.C.App. 68, 334 S.E.2d 509 (1985) (defendant's testimony at time of the homicide he "lost [his] mind," "was so mixed up right then," and "went completely out of [his] mind" was not evidence of insanity); *De La Garza v. State*, 650 S.W.2d 870 (Tex.App.1983) (defendant's testimony he was sleep deprived, intoxicated, confused, and "out of control" was insufficient to support a jury charge on insanity).

Since there was no evidence appellant was unable to distinguish between right and wrong or unable to recognize his actions as wrong at the time of the offense, there was no evidence of insanity and the trial judge properly refused appellant's request to charge insanity. *State v. Todd, supra.*[7] Appellant's conviction is AFFIRMED.

FINNEY, C.J., and TOAL, MOORE and WALLER, JJ., concur.

---

7. In *State v. Campen*, 321 S.C. 505, 469 S.E.2d 619 (Ct.App.1996), the Court of Appeals held, in dicta, a defendant was properly entitled to a charge on insanity where he had testified he had mental difficulties most of his life, suffered from paranoia, and, on the day of the offense, he was paranoid, confused, had no control over his actions, and needed psychological help. We overrule *Campen* insofar as it found this evidence supported a charge on insanity.