THOMAS, J.:
**115 Preston Shands, Jr., appeals his convictions for first-degree burglary, kidnapping, attempted murder, first-degree assault and battery, and possession of a weapon during the commission of a violent crime. On appeal, Shands argues the trial court erred by (1) improperly applying the Batson[1] comparative juror analysis; (2) refusing to quash the *529 indictments; (3) allowing the State to impeach him with a prior conviction; (4) refusing to charge the jury on involuntary intoxication; (5) denying his motion to strike the State's improper comments during closing argument; (6) instructing the jurors they could infer malice from the use of a deadly weapon; (7) failing to require the State to open fully on the law and facts during its initial closing argument; and (8) denying his motion for directed verdict on the kidnapping charge. We affirm in part and reverse in part.
FACTS AND PROCEDURAL HISTORY
In October 2014, a Laurens County grand jury indicted Shands for attempted murder, kidnapping, burglary, possession of a weapon during the commission of a violent crime, and two counts of assault and battery arising out of a domestic incident on July 20, 2014. On the day of the incident, Sharon Shands (Sharon) tried to leave the house after Shands began arguing with her. Shands prevented her from leaving by pulling her back into the house by her hair; he then stabbed her multiple times with a barbecue fork. Sharon was able to escape to the neighbor's house, but Shands followed her and broke into the neighbor's house. The assault ended when police arrived.
Shands testified in his defense and admitted he was responsible for what happened to Sharon. However, he claimed he did not have any memory of the incident because he drank homemade moonshine earlier in the day that must have been laced with a drug. Shands testified he bought the moonshine from someone at work and did not know who made the **116 moonshine or what was in it. Shands believed there "was something more strong and powerful in there ... other than alcohol" because it "had some effect on [him] that took [him] slap clean out of [his] mind." The jury found Shands guilty of attempted murder, possession of a weapon during the commission of a violent crime, assault and battery, burglary, and kidnapping. The trial court sentenced Shands to life imprisonment without the possibility of parole for first-degree burglary, kidnapping, and attempted murder; ten years' imprisonment for first-degree assault and battery; and five years' imprisonment for possession of a weapon during the commission of a violent crime. This appeal followed.
STANDARD OF REVIEW
In criminal cases, this court sits to review errors of law only, and is bound by the trial court's factual findings unless those findings are clearly erroneous. State v. Edwards , 384 S.C. 504, 508, 682 S.E.2d 820, 822 (2009). Thus, on review, this court is limited to determining whether the trial court abused its discretion. Id.
I. BATSON CHALLENGE
Shands argues the trial court did not properly apply the third step of the Batson comparative juror analysis. Shands asserts he proved the State impermissibly struck two jurors on the basis of gender by showing there was a similarly situated female juror on the panel. He contends the trial court "was confused because the initial motion was based on [the State] striking men, and ... Shands then pointed to ... a female[,]" and therefore, the trial court "operated under the mistaken belief [it] could not consider a similarly situated female juror." We affirm.
Generally, "[t]he trial court's findings regarding purposeful discrimination are accorded great deference and will be set aside on appeal only if clearly erroneous." State v. Haigler , 334 S.C. 623, 630, 515 S.E.2d 88, 91 (1999). However, "[w]he[n] the assignment of error is the failure to follow the Batson hearing procedure, [the appellate court] must answer a question of law. When a question of law is presented, [the] standard of review is plenary." State v. Stewart , 413 S.C. 308, 316, 775 S.E.2d 416, 420 (Ct. App. 2015) (quoting **117 State v. Cochran , 369 S.C. 308, 312-13, 631 S.E.2d 294, 297 (Ct. App. 2006) ).
[T]he Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States prohibits the striking of a potential juror based on race or gender. When one party strikes a member of a cognizable racial group or gender, the trial court must hold a Batson hearing if the opposing party requests one.
Id. at 313-14, 775 S.E.2d at 419 (internal citation omitted). "The United States Supreme *530 Court has set forth a three-step inquiry for evaluating whether a party executed a peremptory challenge in a manner which violated the Equal Protection Clause." State v. Inman , 409 S.C. 19, 25, 760 S.E.2d 105, 108 (2014).
First, the opponent of the peremptory challenge must make a prima facie showing that the challenge was based on race [or gender]. If a sufficient showing is made, the trial court will move to the second step in the process, which requires the proponent of the challenge to provide a ... neutral explanation for the challenge. If the trial court finds that burden has been met, the process will proceed to the third step, at which point the trial court must determine whether the opponent of the challenge has proved purposeful discrimination.
State v. Giles , 407 S.C. 14, 18, 754 S.E.2d 261, 263 (2014) (internal citations omitted). In order to prove purposeful discrimination, "[t]he opponent of the strike must show the race or gender[ ]neutral explanation was mere pretext, which generally is established by showing the party did not strike a similarly[ ]situated member of another race or gender." Stewart , 413 S.C. at 314, 775 S.E.2d at 419. "The burden of persuading the court that a Batson violation has occurred remains at all times on the opponent of the strike." State v. Evins , 373 S.C. 404, 415, 645 S.E.2d 904, 909 (2007). "Whether a Batson violation has occurred must be determined by examining the totality of the facts and circumstances in the record." State v. Shuler , 344 S.C. 604, 615, 545 S.E.2d 805, 810 (2001).
During jury selection, the State used four of its five peremptory strikes on three men and one woman. The impaneled jury was composed of nine women and three men. Shands **118 objected based on the State striking male jurors, and the court properly held a Batson hearing. In response to Shands's Batson motion, the State indicated it struck two of the potential jurors because they had convictions for criminal domestic violence (CDV) and the other potential juror because he had four convictions for violating the lottery law. The State's explanation for striking the three male potential jurors satisfied the second step of the Batson analysis because "a prior criminal conviction is a neutral reason to strike" a potential juror. See State v. Casey , 325 S.C. 447, 453 n.2, 481 S.E.2d 169, 172 n.2 (Ct. App. 1997). To meet the third step of the Batson analysis, Shands argued the State sat a similarly situated female juror who had a fraudulent check conviction, indicating the State's gender neutral reason for striking the male potential jurors was pretext. When Shands argued the third step of the Batson analysis, the trial court believed that Shands previously based his objection on male jurors being struck but altered his objection because the State sat a female juror. Shands's counsel reiterated his assertion that the female juror was similarly situated to the males who were struck, which met the third prong of Batson . However, the trial court denied the objection, finding the strikes were gender neutral.
Based on the exchange between Shands and the trial court in the record, we find the trial court misapplied the third step of the Batson analysis by not properly considering whether the female juror was similarly situated to the potential male jurors. Therefore, this issue presents a question of law for this court because the trial court failed to follow the proper Batson hearing procedure. See Stewart , 413 S.C. at 316, 775 S.E.2d at 420 ("[When] the assignment of error is the failure to follow the Batson hearing procedure, [the appellate court] must answer a question of law. When a question of law is presented, [the] standard of review is plenary." (quoting Cochran , 369 S.C. at 312-13, 631 S.E.2d at 297 ) ).
However, we find Shands did not meet his burden to show the State's strikes were based on purposeful discrimination. See Evins , 373 S.C. at 415, 645 S.E.2d at 909 ("The burden of persuading the court that a Batson violation has occurred remains at all times on the opponent of the strike."). The female juror was not similarly situated to the two potential male jurors who had convictions for CDV. It is understandable **119 that the State would want to strike potential jurors who had convictions for CDV because Shands was being tried for attempting to kill his wife. Further, the female juror was not similarly situated *531 to the third potential male juror who had convictions for violating the lottery law. We agree with the State that having multiple convictions is different than having only one conviction that is over a decade old. Considering the totality of facts in the record, we find Shands did not meet his burden of showing the State's use of its peremptory strikes was impermissible. See Shuler , 344 S.C. at 615, 545 S.E.2d at 810 ("Whether a Batson violation has occurred must be determined by examining the totality of the facts and circumstances in the record.").
II. GRAND JURY PROCESS
Shands argues the trial court erred in refusing to quash the indictments because the Laurens County grand jury process is unconstitutional. Shands contends the officer who testified at his grand jury hearing was not listed on his indictments and had no personal knowledge of his case, in violation of section 14-7-1550 of the South Carolina Code (2017).[2] Shands urges this court to correct "a fundamental inequality within the grand jury process in South Carolina: defendants indicted under the statewide grand jury system are afforded different procedures under the law than defendants who are indicted under the county grand jury system[,]" namely that "statewide grand jury proceedings must be recorded."
We affirm the trial court's denial of Shands's motion to quash because Shands did not present clear evidence that there was an abuse of the grand jury proceedings in his case. "When a defendant timely moves to quash an indictment ..., the [trial] court must determine whether the defendant[']s constitutional right to have the criminal allegations against him weighed by a properly constituted grand jury has been violated." Evans v. State , 363 S.C. 495, 510, 611 S.E.2d 510, 518 (2005). "Proceedings before the grand jury are **120 presumed to be regular unless there is clear evidence to the contrary." State v. Thompson , 305 S.C. 496, 501, 409 S.E.2d 420, 424 (Ct. App. 1991). "Speculation about 'potential' abuse of grand jury proceedings cannot substitute for evidence of actual abuse as grounds for quashing an otherwise lawful indictment." Id. at 502, 409 S.E.2d at 424.
When making his motion to quash the indictments, Shands admitted he may "need to call some witnesses" if the State did not stipulate to the grand jury process because the testimony presented to the grand jury was not recorded. The State explained the Laurens County grand jury process:
Essentially, Your Honor, since Solicitor Stumbo has come into office, each individual assistant will, as he is assigned cases, there is a template for the indictment that is electronically produced and put in our electronic record system. We will go in, we will tailor the indictment to the facts that we have and then those are presented out, each individual assistant or deputy will then sign the indictments. But, essentially, yes, the individual agencies are notified the [g]rand [j]ury is coming, they will send a representative and one representative from each department will present all indictments from that individual department. That has been pretty much standard since I started in 1982.
However, the State indicated it "could not tell" whether either of the two officers listed on Shands's indictments testified in front of the grand jury because it did not have a record of who testified. We are unable to say there was a violation in Shands's case from the record presented. Without any clear evidence, Shands's argument that there was a grand jury abuse in his case is pure speculation. Furthermore, we disagree with Shands's argument regarding the nature of the county grand jury system because of "the view long held uniformly by courts nationwide that secrecy of grand jury proceedings is desirable and necessary." See Evans , 363 S.C. at 505, 611 S.E.2d at 515 ; see also State v. Moses , 390 S.C. 502, 521, 702 S.E.2d 395, 405 (Ct. App. 2010) (affirming the trial court's denial of the defendant's motion to quash the indictments even though direct evidence "is difficult to provide due to the *532 secretive nature of the grand jury proceedings"). **121 Therefore, we find the trial court did not abuse its discretion in refusing to quash Shands's indictments.
III. PRIOR CONVICTION
Shands argues the trial court erred in allowing the State to impeach him with his 1976 murder conviction. Shands contends the conviction had no probative value and was highly prejudicial because it was similar to his charge of attempted murder. Shands asserts allowing the State to refer to the conviction as a violent felony did not lessen the prejudice because he was on trial for several violent felonies. Shands also argues he was released from confinement more than ten years prior to trial so the conviction was not admissible. Shands contends he did not open the door to the evidence because his conviction was not contrary to the evidence "that he had never acted in this manner around his wife and the children."
We agree that Shands's conviction was not admissible under Rule 609, SCRE. Rule 609(a)(1), SCRE, allows "evidence that an accused has been convicted of ... a crime [to] be admitted [for the purpose of attacking the credibility of the accused] if the [trial] court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." Rule 609(b), SCRE, then limits the admissible convictions to those when no more than "a period of ... ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction." However, convictions that are over ten years old can be admitted "in the interests of justice" if the trial court determines "that the probative value of the conviction ... substantially outweighs its prejudicial effect." Rule 609(b) (emphasis added). The trial court should consider the following factors in determining whether the probative value of a prior conviction outweighs its prejudicial effect: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue. Green v. State , 338 S.C. 428, 433-34, 527 S.E.2d 98, 101 (2000).
**122 This case presents the novel issue in South Carolina of whether parole following a prison term constitutes "confinement" for the purposes of the ten-year time limit under Rule 609(b). The trial court found Shands's prior conviction for murder could be used to impeach him because he was still on parole for the conviction when he committed the crimes charged. In State v. Scott , this court held a defendant's 1977 robbery conviction was not too remote to be used to impeach her because, although she received parole in 1980, her sentence was still in effect until 1986. 326 S.C. 448, 451-52, 484 S.E.2d 110, 112 (Ct. App. 1997). However, the trial in Scott was prior to the adoption of the South Carolina Rules of Evidence. Therefore, the Scott court relied on common law to find the defendant's conviction was not too remote and did not interpret the confinement language from Rule 609(b). See id. at 450, 484 S.E.2d at 111. Under the common law rule, "[t]here [wa]s no fixed time in [South Carolina] after which a conviction bec[ame] too remote." State v. Sarvis , 317 S.C. 102, 105, 450 S.E.2d 606, 608 (Ct. App. 1994). For those reasons, we disagree with the State and find Scott is not controlling in the instant case. We note the majority of jurisdictions[3] considering this issue have held that probation and parole do not count as confinement for the purposes of rules and statutes similar to our Rule 609(b). See United States v. Rogers , 542 F.3d 197, 198 (7th Cir. 2008) ("[P]robation does not constitute 'confinement' within the meaning of Rule 609(b)."); Bizmark, Inc. v. Kroger Co. , 994 F.Supp. 726, 728 (W.D. Va. 1998) (" '[R]elease from confinement,' for 609(b) purposes means release from actual imprisonment, and therefore, [ ] neither parole nor probation constitutes confinement under the rule."); Allen v. State , 286 Ga. 392, 687 S.E.2d 799, 803 (2010) ("The legislature's distinction of 'confinement' from release on parole *533 and suspended and probated sentences, when coupled with the construction of identical statutory language by the federal courts and our sister states, leads us to conclude that probation does not qualify as confinement ...."); Commonwealth v. Treadwell , 911 A.2d 987, 991 (Pa. Super. Ct. 2006) ("After reviewing the relevant statutory language and the rationale **123 relied upon in other jurisdictions, we agree with the federal courts and our sister states, and conclude that probation does not qualify as confinement ....").
We follow the majority of jurisdictions in holding that probation and parole do not constitute "confinement" for the purposes of Rule 609(b) ; confinement ends when a defendant is released from actual imprisonment. Although Rule 609(b) does not define the term confinement, Black's Law Dictionary defines the term as "[t]he act of imprisoning or restraining someone; the quality, state, or condition of being imprisoned or restrained." Confinement, BLACK'S LAW DICTIONARY (10th ed. 2014). Conversely, "[t]he term parole means a conditional release from imprisonment." State v. Ellis , 397 S.C. 576, 579-80, 726 S.E.2d 5, 7 (2012). Although Shands was not technically a "free citizen" while he was on parole, we find he was no longer confined because he was not actually imprisoned. See id. at 581, 726 S.E.2d at 7 (recognizing a defendant on parole "was not a free citizen" and had "[a]ll the consequences of the judgement [still] upon him, except that he had leave of absence from prison" (quoting Crooks v. Sanders, Superintendent of State Penitentiary , 123 S.C. 28, 36-37, 115 S.E. 760, 763 (1922) ) ). Therefore, Shands's confinement for his 1976 conviction ended in 2003 when he was released on parole, making his conviction over ten years old and presumptively inadmissible under Rule 609(b). See Colf , 337 S.C. at 626, 525 S.E.2d at 248 (" Rule 609(b) establishes a presumption against admissibility of remote convictions ....").
Furthermore, the State did not present sufficient evidence to show the probative value of Shands's conviction substantially outweighed its prejudicial effect. See id. at 626-27, 525 S.E.2d at 248 ("[T]he State bears the burden of establishing facts and circumstances sufficient to substantially overcome that presumption."); Rule 609(b) (explaining a stale conviction is not admissible unless "in the interests of justice" the trial court determines "the probative value of the conviction[,] supported by specific facts and circumstances[,] substantially outweighs its prejudicial effect"). Because Shands was convicted over forty years ago and was released from prison over ten years ago, we believe his conviction had little probative value. See **124 State v. Black , 400 S.C. 10, 26, 732 S.E.2d 880, 889 (2012) ("The genesis of the rule's ten-year provision was the belief that after ten years, the probative value of the conviction with respect to a person's credibility has diminished to the point where it should no longer be admissible."). Moreover, the prejudicial effect was high because of the nature of his charges. Thus, the trial court erred by finding the prior conviction admissible under Rule 609(b).
However, we find the trial court did not err in admitting Shands's prior conviction because Shands opened the door to such evidence. "[O]therwise inadmissible evidence may be properly admitted when opposing counsel opens the door to that evidence." State v. Page , 378 S.C. 476, 482, 663 S.E.2d 357, 360 (Ct. App. 2008). "A party cannot complain of prejudice from evidence to which he opened the door." State v. Culbreath , 377 S.C. 326, 333, 659 S.E.2d 268, 272 (Ct. App. 2008). At trial, Shands elicited testimony during the cross-examination of numerous witnesses to show that he had never reacted violently before. For example, Shands's counsel asked Sharon if this was the first time "he ha[d] ever done something like this." Shands's counsel also elicited testimony from Shands's two sons about whether they had ever seen Shands act in a similar manner. Furthermore, Shands's counsel asked the neighbor if Shands's behavior on the night of the incident was "entirely out of character." Because Shands opened the door about his past non-violent actions, the State was entitled to rebut his assertions with evidence of his prior conviction for a violent felony. See State v. Taylor , 333 S.C. 159, 175, 508 S.E.2d 870, 878 (1998) ("[B]ecause appellant 'opened the door' about his relationship with his wife, *534 the solicitor was entitled to cross-examine him regarding the relationship, even if the responses brought out appellant's prior criminal domestic violence conviction."). Therefore, the trial court did not err in admitting Shands's prior conviction. See State v. Robinson, 305 S.C. 469, 474, 409 S.E.2d 404, 408 (1991) (explaining one who opens the door to evidence cannot complain of its admission).
IV. VOLUNTARY INTOXICATION
After resting his case, Shands requested that the trial court charge the jury on involuntary intoxication. The trial court denied Shands's request but granted the State's request to **125 charge that voluntary intoxication was not a defense to a crime. On appeal, Shands argues the trial court erred in refusing to charge the jury on involuntary intoxication because his testimony indicated that the moonshine he drank was unknowingly "spiked with something other than alcohol." Shands contends the trial court improperly commented on the facts when it charged voluntary intoxication without also charging involuntary intoxication. We disagree.
At trial, "[t]he law to be charged is determined from the facts presented." State v. Lewis , 328 S.C. 273, 278, 494 S.E.2d 115, 117 (1997).
Involuntary intoxication may result from innocently consuming an intoxicant, through being tricked into it by another, or being forced to take it, or perhaps through unanticipated side effects of a prescription drug taken on orders of a physician. If [a jury] find[s] the defendant was given drugs or alcoholic beverages without his knowledge, and as a result, he lost his ability to exercise independent judgment and volition while committing the crimes alleged against him, then it would be [the jury's duty] to find the defendant not guilty.
RALPH KING ANDERSON, JR., SOUTH CAROLINA REQUESTS TO CHARGE-CRIMINAL § 6-4 (2012). However, "voluntary intoxication or use of drugs does not constitute a defense to a crime." State v. Hartfield , 300 S.C. 469, 473, 388 S.E.2d 802, 804 (1990).
We find the trial court did not err in refusing to charge involuntary intoxication because Shands voluntarily consumed an illegal intoxicant. See S.C. Code Ann. § 61-6-4010(A) (2009) (making it illegal for a person to "manufacture, store, keep, receive, have in possession, transport, ship, buy, sell, barter, exchange, or deliver alcoholic liquors, except liquors acquired in a lawful manner" or "accept, receive, or have in possession alcoholic liquors for unlawful use"). Shands admitted he voluntarily drank the "homemade moonshine" and did not know who made it. He knew the moonshine was stronger than a typical alcoholic beverage because his coworkers told him the moonshine was "the grand[d]addy of all, the cremator of all whiskey" and he could not "say [he] drunk anything" until he "tasted the grand[d]addy." Moreover, **126 Shands admitted he "had no idea what was in [the moonshine] and [he] had no idea how [he] was going to react to it," but he decided to drink it anyway.
We agree with the reasoning of the California Court of Appeals when it considered whether a defendant was entitled to an involuntary intoxication charge when he voluntarily smoked a marijuana cigarette given to him by others that was unknowingly laced with phencyclidine (PCP). See People v. Velez , 175 Cal.App.3d 785, 221 Cal.Rptr. 631, 632 (1985). The California Court of Appeals affirmed the trial court's denial of an involuntary intoxication charge, reasoning
[The defendant's] defense depends on the validity of [the] defendant's assumptions that the cigarette did not contain PCP and would produce a predictable intoxicating effect. However, ... these assumptions are tested not by [the] defendant's subjective belief but rather by the standard of a reasonable person. In this regard, it is common knowledge that unlawful street drugs do not come with warranties of purity or quality associated with lawfully acquired drugs such as alcohol. Thus, ... unlawful street drugs are frequently not the substance they purport to be ....
Id. at 637. Similarly, in the instant case, Shands knowingly consumed an illegal, unregulated liquor and had no right to assume the moonshine would cause a predictable intoxicating effect. Further, because there was no evidence to support a charge for involuntary *535 intoxication, the trial court did not err in charging voluntary intoxication without an accompanying charge on involuntary intoxication. See Lewis , 328 S.C. at 278, 494 S.E.2d at 117 ("The law to be charged is determined from the facts presented at trial."). Therefore, we find the trial court did not err.
V. COMMENTS DURING THE STATE'S CLOSING ARGUMENT
Shands argues the trial court erred by not striking the State's improper comments during closing argument and not instructing the jurors to disregard the comments. Shands asserts the State's comment: "This is a jealous, controlling husband who was not going to let his property leave that house," was "highly inflammatory and not based on the evidence." We disagree.
**127 In its reply closing argument, the State described its view of the case and evidence:
And what happens, he is an almost 60-year-old man with a 38-year-old wife and she is beautiful and she is a good woman and she was taking care of him but it wasn't good enough for him. He starts getting controlling. [The neighbor] told y'all, [Shands] could be jealous if you tried to talk to [Sharon] in the neighborhood. He starts getting jealous and controlling. And it gets worse and it gets worse and he is arguing and he is fussing and he is drinking and Sharon said we were on pins and needles. So this, he may not have put his hands on her before but this is a relationship that is going downhill fast. And what happens on July 20, 2014, she finally says, you know what, I am leaving, I am going. Come on kids, get in the car. And that is when he snaps. He is not, his wife and his kids that he provides for and he works for that are his property, she is not leaving him, she is not taking those kids, no, no, no, no. Grabs her by the hair, grabs the first thing he can get his hands on and starts going at her. This isn't about he was drinking something that day, this is a jealous, controlling husband who was not going to let his property leave that house.
Shands objected and moved to strike, and the trial court instructed the State to continue.
We find the trial court did not abuse its discretion in denying Shands's motion to strike because the State's comments were not outside of the evidence. See State v. Penland , 275 S.C. 537, 539, 273 S.E.2d 765, 766 (1981) ("The control of argument is normally within the discretion of the trial [court], and we will not disturb [its] ruling whe[n] there is no abuse of discretion."). In its closing argument, the State "may argue [its] version of the testimony presented, and furthermore may comment on the weight to be accorded such testimony." State v. New , 338 S.C. 313, 319, 526 S.E.2d 237, 240 (Ct. App. 1999). In the instant case, Shands responded affirmatively when the State asked if he "got pretty jealous and kind of controlling" and if "things ... started falling apart." Sharon testified Shands was "controlling" in the months leading up to the incident, and she "walked on pins and needles every day [because she] didn't know what to expect" from him. The neighbor recalled Shands got "a little **128 jealous at times" if someone tried to talk to Sharon, and Shands "would say something to ... get her attention." The evidence further showed Shands did not allow Sharon to leave the house when she tried to leave with the children, pulling her by the hair to get her to stay. Furthermore, Shands was not prejudiced by the comments in light of the overwhelming evidence of his guilt, including his testimony that he committed the acts in question and his lack of a viable defense. See Humphries v. State , 351 S.C. 362, 373, 570 S.E.2d 160, 166 (2002) ("Improper comments do not automatically require reversal if they are not prejudicial to the defendant, and the appellant has the burden of proving he did not receive a fair trial because of the alleged improper argument."). Therefore, we find the trial court did not err in refusing to strike the State's comments during its closing argument.
VI. INFERRED MALICE JURY INSTRUCTION
Shands argues the trial court erred in instructing the jury that malice could be inferred from the use of a deadly weapon and giving the example of a knife as a deadly weapon. Shands contends the instruction was *536 contrary to State v. Belcher[4] because the attempted murder charge could have been reduced or mitigated by the lesser-included offense of assault and battery of a high and aggravated nature (ABHAN) or Shands's defense that he lacked criminal intent. We agree that the trial court erred in instructing the jury that malice could be inferred from the use of a deadly weapon.
"The implication of malice may arise from the use of a deadly weapon." State v. Campbell , 287 S.C. 377, 379, 339 S.E.2d 109, 109 (1985) (per curiam). However, "the 'use of a deadly weapon' implied malice instruction has no place in a murder (or assault and battery with intent to kill[5 ][ (ABWIK) ] ) prosecution whe[n] evidence is presented that would **129 reduce, mitigate, excuse[,] or justify the killing (or the alleged [ABWIK] )." Belcher , 385 S.C. at 610, 685 S.E.2d at 809 (footnote omitted). "A deadly weapon is generally defined as 'any article, instrument[,] or substance [that] is likely to produce death or great bodily harm.' " Campbell , 287 S.C. at 379, 339 S.E.2d at 109 (quoting State v. Sturdivant , 304 N.C. 293, 283 S.E.2d 719, 725 (1981) ).
"A person who, with intent to kill, attempts to kill another person with malice aforethought, either expressed or implied, commits the offense of attempted murder." S.C. Code Ann. § 16-3-29 (2015). In State v. King , our supreme court considered the requisite mens rea required for attempted murder. See State v. King , 422 S.C. 47, 54, 810 S.E.2d 18, 22 (2017). The majority opinion, written by Chief Justice Beatty, held attempted murder requires the specific intent to commit murder, which is a higher level of mens rea than is required for murder.[6] Id. at 54-64, 810 S.E.2d at 22-27. The court discussed the fact that attempt crimes require the highest level of mens rea because "it is logically impossible to attempt an unintended result." Id. at 56, 810 S.E.2d at 23 (quoting 22 C.J.S. Criminal Law: Substantive Principles § 156, at 221-22 (2016) ). The court explained attempted murder was not a mere codification of ABWIK, a general intent crime, because the General Assembly "purposefully add[ed] the language 'with intent to kill' to 'malice aforethought, either express or implied.' "[7] King , 422 S.C. at 61, 810 S.E.2d at 25. After **130 considering the legislative history of the attempted murder statute, the court held a "specific intent to kill" is an element of attempted murder, and the trial court erred in instructing the jury that it was not. Id. at 61-64, 810 S.E.2d at 25-27. Although the majority opinion in King did not directly address the issue of whether an inferred malice charge was warranted in an attempted murder case, the court indicated its belief in a footnote that malice can never be implied in an attempted murder case. See id. at 64 n.5, 810 S.E.2d at 27 n.5. The court stated:
While we find it unnecessary to address King's additional sustaining ground [that the trial court erred in instructing the jury that malice could be inferred from the use *537 of a deadly weapon], we would respectfully suggest to the General Assembly to re-evaluate the language following "malice aforethought" as the inclusion of the word "implied" in section 16-3-29 is arguably inconsistent with a specific[ ]intent crime. See [ Keys v. State , 104 Nev. 736, 766 P.2d 270, 273 (1988) ] (stating, "[o]ne cannot attempt to kill another with implied malice because there is no such criminal offense as an attempt to achieve an unintended result" (citation and internal quotation marks omitted) ). Moreover, if there is no evidence that one charged with attempted murder had express malice and a specific intent to kill, we believe the crime would involve a lower level of intent[, and] thus, would fall within the lesser degrees of the assault and battery offenses codified in section 16-3-600. See S.C. Code Ann. § 16-3-600 (2015 & Supp. 2016) (identifying levels and degrees of assault and battery offenses).
Id.
"[S]pecific intent means that the defendant consciously intended the completion of acts comprising the [completed] offense." State v. Nesbitt , 346 S.C. 226, 231, 550 S.E.2d 864, 866 (Ct. App. 2001) (quoting State v. Sutton , 340 S.C. 393, 397, 532 S.E.2d 283, 285 (2000) ). "ABHAN is a lesser-included offense of attempted murder." State v. Middleton , 407 S.C. 312, 315, 755 S.E.2d 432, 434 (2014). "An ABHAN charge is **131 appropriate when the evidence demonstrates the defendant lacked the requisite intent to kill." State v. Dennis , 402 S.C. 627, 638, 742 S.E.2d 21, 27 (Ct. App. 2013) (per curiam) (quoting State v. Coleman , 342 S.C. 172, 176, 536 S.E.2d 387, 389 (Ct. App. 2000) ).
[ABHAN] is the unlawful act of violent injury to another accompanied by circumstances of aggravation. Circumstances of aggravation include the infliction of serious bodily injury, great disparity in the ages or physical conditions of the parties, a difference in sexes, the purposeful infliction of shame and disgrace, taking indecent liberties or familiarities with a female, and resistance to lawful authority.[8 ]
State v. Green , 327 S.C. 581, 585, 491 S.E.2d 263, 264-65 (Ct. App. 1997) (internal citations omitted).
In light of our supreme court's discussion in King , we find the State needed to prove Shands acted with express malice and the specific intent to kill in order to be found guilty of attempted murder. See King , 422 S.C. at 54-64, 810 S.E.2d at 22-27. Therefore, we question whether an implied malice instruction is proper in any attempted murder trial. However, even if an implied malice instruction was appropriate in an attempted murder case, we do not believe it was appropriate in Shands's case. As Shands and the State recognized at trial, if the jury did not believe Shands had the specific intent to kill, he would have been guilty of the lesser-included offense of ABHAN. Despite the number of times Shands stabbed Sharon and the nature of the attack, a jury could have found Shands only had a general intent to kill instead of the higher mens rea of specific intent to kill. See State v. Kinard , 373 S.C. 500, 504, 646 S.E.2d 168, 169 (Ct. App. 2007) (" 'General intent' is defined as 'the state of mind required for the commission of certain common law crimes not requiring specific intent' and it 'usually takes the form of recklessness ... or negligence.' "
**132 (quoting BLACK'S LAW DICTIONARY (7th ed. 1999) ) ); Nesbitt , 346 S.C. at 231, 550 S.E.2d at 866 ("[S]pecific intent means that the defendant consciously intended the completion of acts comprising the [completed] offense." (quoting Sutton , 340 S.C. at 397, 532 S.E.2d at 285 ) ). Therefore, because there was evidence to reduce Shands's charge, the trial court erred in instructing the jury that malice could be inferred from the use of a deadly weapon. See Belcher , 385 S.C. at 610, 685 S.E.2d at 809 (holding the use of a deadly weapon inferred malice instruction is not proper *538 when there was evidence to reduce the crime).
This error requires reversal of Shands's conviction for attempted murder.[9] However, we find the trial court's error caused Shands no prejudice as to his convictions for first-degree burglary, kidnapping, first-degree assault and battery, and possession of a weapon during the commission of a violent crime, and we affirm those convictions.
VII. CLOSING ARGUMENT PROCEDURE
Shands argues the trial court violated his due process rights[10] by refusing to require the State to open fully on the law and the facts in its initial closing argument so he would have the opportunity to respond to the State's entire argument in his closing argument. Shands argues the State "revealed to the jurors for the first time [its] theory about the kidnapping charge" in its reply closing argument. Shands also states he would have liked to respond to
what [he] considered to be somewhat an emotional attack on [him] both in some of how it was delivered but in particular[ ] the language that was used. [He] would have responded about what [the State] said about kidnapping, [he] would have responded to what [it] said about placing the police on **133 trial, that was not [his] purpose. And [he] would have responded to ... the argument made about Sharon leaving that day as well as a number of things that [he thought it] said that exceeded the bounds of what the evidence really was ....
Shands contends even if some of the evidence fairly arose from the evidence at the trial, "there was [no] guarantee the [State] would make those same arguments during [its] closing argument" and it was "fundamentally unfair to require [him] to predict the prosecutor's closing argument."
In State v. Beaty , our supreme court declined to create a rule specifying "the content and order of closing arguments in criminal cases in which a defendant introduces evidence," noting it did not have the authority "to promulgate a procedural rule for future cases by simply issuing an opinion." State v. Beaty , 423 S.C. 26, 36-37, 39, 46, 813 S.E.2d 502, 507, 509, 512 (2018). The supreme court extensively discussed the history of South Carolina's rules and practices surrounding the procedure of closing arguments in criminal cases. Id. at 36-43, 813 S.E.2d at 507-11. The court explained the existing procedure applicable to Shands's case as follows:
[I]n cases in which a defendant introduces evidence of any kind, even through a prosecution witness, the State has the final closing argument. However, in cases in which the State is entitled to the reply argument, there is no common law or codified rule as to whether the State must open in full on the law, or the facts, or both, or neither, and there is no rule governing the content of the State's reply argument.
Id. at 42, 813 S.E.2d at 510-11. The court, instead, noted it "retain[ed] the authority to determine-on a case-by-case basis-whether a defendant's due process rights have been violated by procedural methods employed during a trial." Id. In Beaty , the supreme court found the State's closing arguments did not violate the defendant's procedural due process rights because the State's theories were (1) "arguably a proper response" to the defendant's closing argument, (2) "largely inconsequential to the question" of whether the defendant murdered the victim, (3) supported by evidence in the record, and (4) not prejudicial to the defendant. Id. at 43-47, 813 S.E.2d at 511-13.
**134 Therefore, we must determine whether Shands's due process rights were violated in this instance. "[P]rocedural due process contemplates a fair trial."
*539 Id. at 43, 813 S.E.2d at 511. "A denial of due process occurs when a defendant in a criminal trial is denied the fundamental fairness essential to the concept of justice." Id. (quoting State v. Hornsby , 326 S.C. 121, 129, 484 S.E.2d 869, 873 (1997) ). Our "case law focuses upon allegedly inflammatory or unsupported content of the State's closing argument, not upon whether the State must open in full on the facts and not upon reply arguments which have a basis in the record but to which a defendant is not allowed to respond." Id. "Improper comments do not automatically require reversal if they are not prejudicial to the defendant, and the appellant has the burden of proving he did not receive a fair trial because of the alleged improper argument." Humphries , 351 S.C. at 373, 570 S.E.2d at 166. "The relevant question is whether the [State]'s comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id.
Although Shands argues he did not get a chance to reply to the State's version of the facts, we find he was aware of the State's arguments and could have used his closing argument to respond to them. Shands was aware of the State's theory of the kidnapping charge because the State explained what facts it believed supported the charge in response to Shands's directed verdict motion. The State indicated the kidnapping charge was appropriate because Shands grabbed Sharon by the hair to pull her back into the house and would not let her leave through the garage. The State indicated in its initial closing argument that the kidnapping in Shands's case was not "the traditional kidnapping" a person usually thinks about when "there is [an] Amber alert and somebody's child is missing." The State explained: "Kidnapping is confining someone against their will and it doesn't have to be for a long time, there is no set amount of time that you have to confine somebody." Although the jury had not yet heard the State's full theory for kidnapping, Shands was aware of its theory and knew from the State's initial closing argument that the State was focusing on a brief confinement to support the kidnapping charge. Furthermore, the State's comments in its closing argument regarding kidnapping were arguably in reply to **135 Shands's closing argument comment that he "had no idea how [the State] would explain kidnapping to [the jury] under this evidence."
Regarding Shands's argument that the State "emotional[ly] attack[ed]" him in its reply closing argument, we believe this matter was inconsequential to the issue of Shands's guilt, and as discussed in Section V, these comments were not prejudicial. Shands further argued he would have responded to the State's comments about him "placing the police on trial." We believe the State's comments during its reply closing argument were arguably in response to Shands's closing argument highlighting the fact that the police officers never asked him what his side of the story was and stating the lack of information in the case was "the fault of the police officers." Furthermore, these comments were insignificant to the issues before the jury.
Accordingly, while the State did "not restrict its reply argument to matters raised by" Shands and the trial court did not allow him to respond to the foregoing points, we hold Shands did not suffer prejudice as a result because he was not denied "the fundamental fairness essential to the concept of justice." See Beaty , 423 S.C. at 45, 813 S.E.2d at 512 (quoting Hornsby , 326 S.C. at 129, 484 S.E.2d at 873 ).
VIII. DIRECTED VERDICT
Shands argues the trial court erred in denying his motion for a directed verdict on the kidnapping charge because the evidence did not show that Shands "actually restrained" Sharon. Shands further argues the kidnapping statute is unconstitutionally vague and overbroad because the facts of his case did not put him on notice that his conduct could constitute kidnapping. We disagree.
"When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." State v. Hernandez , 382 S.C. 620, 624, 677 S.E.2d 603, 605 (2009). If the State fails to produce evidence of the charged offense, then the defendant is entitled to a directed verdict. Id. "In an appeal from the denial of a directed verdict motion, the appellate *540 court must view the evidence in the light most favorable to the State." **136 State v. Cope , 405 S.C. 317, 348, 748 S.E.2d 194, 210 (2013). "If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the [c]ourt must find the case was properly submitted to the jury." Id . (quoting State v. Curtis , 356 S.C. 622, 633-34, 591 S.E.2d 600, 605 (2004) ).
Kidnapping occurs when one "unlawfully seize[s], confine[s], inveigle[s], decoy[s], kidnap[s], abduct[s,] or carr[ies] away" another person. S.C. Code Ann. § 16-3-910 (2015). "A kidnapping commences when [a victim] is [lawfully] deprived of his [or her] freedom and continues until freedom is restored." State v. Kornahrens , 290 S.C. 281, 287, 350 S.E.2d 180, 184 (1986). "[T]he crime of kidnapping in South Carolina is broad in scope" and "encompass[es] restraint regardless of duration." Lozada v. S.C. Law Enf't Div. , 395 S.C. 509, 513, 719 S.E.2d 258, 260 (2011).
We find Shands's argument regarding the constitutionality of the kidnapping statute is without merit because our supreme court has already held the kidnapping statute is not unconstitutionally vague and overbroad. See State v. Smith , 275 S.C. 164, 166, 268 S.E.2d 276, 277 (1980) ("The terms of th[e] statute are clear and unambiguous. It proscribes the forceful seizure, confinement[,] or carrying away of another against his will without authority of law. We hold it is not unconstitutionally vague ....").[11] Further, we hold the trial court did not err in denying Shands's motion for a directed verdict because, viewing the evidence in the light most favorable to the State, there was evidence to support the kidnapping charge. Sharon testified she tried to leave the house, but Shands kept closing the garage door so she could not escape. Sharon also testified Shands pulled her by the hair and tried to drag her into the house so she could not leave. The sons both recalled Shands grabbing Sharon by the hair as **137 well. We find this evidence supported the kidnapping charge. Shands appears to argue that because his attempts to close the garage door and pull Sharon inside the house by her hair were not ultimately successful in preventing Sharon from leaving the house, his actions were only attempts to restrain, rather than actual restraints. We disagree. The kidnapping statute does not prescribe a duration, and therefore, by preventing Sharon from leaving the house, Shands restrained and confined her for the purposes of the statute. See Lozada , 395 S.C. at 513, 719 S.E.2d at 260 (stating that kidnapping "encompass[es] restraint regardless of duration"). Therefore, we affirm the trial court's denial of Shands's motion for a directed verdict on the kidnapping charge.
CONCLUSION
For the foregoing reasons, we affirm Shands's convictions for first-degree burglary, kidnapping, first-degree assault and battery, and possession of a weapon during the commission of a violent crime, and we reverse his conviction for attempted murder.
AFFIRMED IN PART AND REVERSED IN PART.
WILLIAMS and MCDONALD, JJ., concur.

Batson v. Kentucky , 476 U.S. 79, 96-98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (adopting a three-step inquiry for evaluating whether a party used a peremptory challenge to strike a juror in a manner that violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution).

Section 14-7-1550 states: "The foreman of the grand jury ... may swear the witnesses whose names shall appear on the bill of indictment in the grand jury room. No witnesses shall be sworn except those who have been bound over or subpoenaed in the manner provided by law."

Because Rule 609(b)"is identical to the federal rule, federal cases may be persuasive." See State v. Colf , 337 S.C. 622, 626, 525 S.E.2d 246, 248 (2000).

385 S.C. 597, 685 S.E.2d 802 (2009).

According to the Omnibus Crime Reduction and Sentencing Reform Act, the Legislature abolished the offense of ABWIK and replaced it with attempted murder. See Act No. 273, 2010 S.C. Acts 1949-50. ABWIK was "an unlawful act of violent nature to the person of another with malice aforethought, either express or implied." State v. Hinson , 253 S.C. 607, 611, 172 S.E.2d 548, 550 (1970).

Acting Justices Benjamin and Hayes concurred in the majority opinion. Acting Justice Pleicones concurred in result only and did not write a separate opinion.

Justice Kittredge wrote a concurrence to express his belief that the General Assembly intended to codify ABWIK when it enacted the attempted murder statute. King , 422 S.C. at 71, 810 S.E.2d at 30 (Kittredge, J., concurring). Justice Kittredge noted the statutory offense of attempted murder had an ambiguity because the language "with intent to kill" was included with the "seemingly contradictory" language of "with malice aforethought, either expressed or implied." Id. at 73, 810 S.E.2d at 32 (Kittredge, J., concurring). However, Justice Kittredge believed a specific intent to kill was not required because ABWIK, a general intent crime, included "with intent to kill" in the name of the common law crime. Id. at 73-74, 810 S.E.2d at 32 (Kittredge, J., concurring). Justice Kittredge further pointed to "the legislature's use of the verbatim definition of ABWIK in the section 16-3-29 offense of attempted murder." Id. at 73, 810 S.E.2d at 32 (Kittredge, J., concurring). Therefore, Justice Kittredge would have affirmed the trial court's instruction that specific intent to kill was not an element of attempted murder. Id. at 73-74, 810 S.E.2d at 32 (Kittredge, J., concurring).

The legislature codified ABHAN in section 16-3-600(B)(1) of the South Carolina Code (2015). However, the codified version's effective date was after the dates of the alleged offenses in this case. Thus, the pre-codified version of ABHAN applies to Shands's case. See Pierce v. State , 338 S.C. 139, 145, 526 S.E.2d 222, 225 (2000) ("The application of a new or amended criminal statute may prompt a defendant to allege a violation of the Ex Post Facto Clause, arguing the court may not apply a statute enacted or amended after the date of an offense in his case.").

Because Shands's argument regarding the propriety of the inferred malice instruction is dispositive, we do not consider Shands's argument that giving the example of a knife as a deadly weapon was a comment on the facts of the case. See State v. Henson , 407 S.C. 154, 167 n.4, 754 S.E.2d 508, 515 n.4 (2014) (declining to reach an additional argument where the resolution of the first issue was dispositive).

Due process requires that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. XIV § 1 ; S.C. Const. art. 1, § 3.

Other than an amendment to the maximum sentence, the kidnapping statute in 1980 was identical to the kidnapping statute in effect at the time of Shands's case. See Smith , 275 S.C. at 166, 268 S.E.2d at 277 ("Whoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever without authority of law, ..., shall be guilty of a felony and, upon conviction, shall suffer the punishment of life imprisonment ..." (quoting S.C. Code Ann. § 16-3-910 (Supp. 1979) ) ).