# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Shelby Harper Taylor, Appellant.

Appellate Case No. 2018-000341

Appeal From Horry County
Robert E. Hood, Circuit Court Judge

Opinion No. 5853
Submitted March 1, 2021 – Filed September 1, 2021

**AFFIRMED**

John H. Blume, III, of Elizabeth Franklin-Best, P.C., and
Emily C. Paavola, of Death Penalty Resource & Defense
Center, both of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Mark Reynolds Farthing, both of
Columbia; and Solicitor Jimmy A. Richardson, II, of
Conway, all for Respondent.

**HEWITT, J.:** The question in this case is whether "inferred malice"—the concept
that a jury may deduce malice from a defendant's actions—is inconsistent with the
specific intent to kill required for attempted murder. We hold it is not. After all,
actions can speak louder than words.

Sometimes the jury is left with nothing to consider except the defendant's actions. That was the case here. Shelby Harper Taylor placed her newborn baby in a trash bag and left the bag in a dumpster. The jury was charged that it could not convict her unless it found she intended to kill the baby and that the difference between "express" and "implied" malice related to whether malice was proved by words, preparation, or by inferring malice from other facts. This was proper under the law. Thus, we affirm.

## FACTS

This case's background is heartbreaking. Taylor gave birth to a baby girl in the bathroom of her apartment during the early hours one morning in April 2015. She was in her early twenties and had successfully hidden the pregnancy from her family. This was Taylor's second child.

At the time, she lived in the apartment with her husband and their sixteen-month-old daughter. After giving birth, Taylor placed the newborn inside a trash bag, tied the bag, took the bag downstairs, and placed it in the apartment's shared trash dumpster. Taylor also cleaned the bathroom.

Taylor's husband and toddler slept through all of this. Taylor proceeded with her day as though nothing had happened: she took a nap, took her toddler for a well checkup, and visited her mother.

Early that afternoon, two boys from another unit in the apartment complex were taking out the trash and heard what they believed was an animal in the dumpster. When they investigated, the boys saw the newborn's face pressed against the side of the trash bag and rescued the baby.

A receipt inside the bag led police to a local restaurant. The police got the restaurant's internal surveillance video, isolated the picture of a person of interest, and sent the image to local media.

Taylor went to the police station after she learned her picture was on the news. Taylor denied knowing anything about the baby or how the baby came to be in a bag that indisputably contained her trash. Police did not believe her denial, nor did Taylor's husband, whom police initially questioned separately.

Taylor confessed after her husband sat with police while they interviewed her a second time. She was then taken to the hospital where a doctor confirmed she had recently given birth. Taylor also spoke with a psychologist and a social worker. She

told them she was not the victim of any domestic abuse and that she had hidden the pregnancy from her family.

The basic facts we have recited were not disputed at trial. The sole issue in court was Taylor's mental state and her intent. Taylor claimed she did not intend to kill the newborn when she discarded the child. She said the event occurred during a state of Transient Peripartum Psychosis. In other words, she claimed this happened while she was temporarily delusional.

Taylor supported this argument with testimony from an expert who opined Taylor experienced impermanent psychosis in the months leading up to and immediately after the child's birth. The expert explained Taylor told him she was the victim of emotional and physical domestic abuse, she was stressed because her family already did not support her decision to have the couple's first child, and the couple was in a difficult financial situation. The expert explained these things (and others) were consistent with a finding of Transient Peripartum Psychosis.

The State argued the only logical inference from the evidence was that Taylor intended to kill the child. The State believed this was the most obvious explanation for placing the newborn in a trash bag and dumpster rather than dropping the baby at a hospital or fire station, and this was also the best way to understand Taylor's hiding the pregnancy from her family and not seeking prenatal care. The State believed Taylor's theory of psychosis was refuted by Taylor's months-long decision to conceal her pregnancy, by Taylor's cover-up of the birth, and by the fact that Taylor resumed normal daily activities immediately following the birth.

The case was tried in February 2018. This was shortly after our supreme court's October 2017 decision in *State v. King*, holding attempted murder is a specific intent crime. 422 S.C. 47, 63–64, 810 S.E.2d 18, 26–27 (2017). *King* was a central feature of the discussions concerning the jury charges.

The jury convicted Taylor of attempted murder, and the trial court sentenced her to twenty-five years' imprisonment. This appeal followed.

## ISSUE

Whether the trial court erred in instructing the jury on inferred malice.

## STANDARD OF REVIEW

In criminal cases, the appellate court sits solely to review errors of law. *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001). "In reviewing jury charges for

error, this Court must consider the circuit court's jury charge as a whole in light of the evidence and issues presented at trial." *State v. Simmons*, 384 S.C. 145, 178, 682 S.E.2d 19, 36 (Ct. App. 2009).

## LAW/ANALYSIS

Attempted murder was codified as part of the Omnibus Crime Reduction and Sentencing Reform Act of 2010, which abolished several common law assault and battery offenses including assault and battery with intent to kill, also known as ABWIK. *See* Act No. 273, 2010 S.C. Acts 1947–49. It replaced these with new, codified offenses including the crime of attempted murder. *Id*. at 1948. In pertinent part, the attempted murder statute provides that "[a] person who, with intent to kill, attempts to kill another person with malice aforethought, either express or implied, commits the offense of attempted murder." S.C. Code Ann. § 16-3-29 (2015).

*King* held the attempted murder statute "[wa]s not [simply] a codification of the offense of ABWIK[, instead] the General Assembly expressly repealed the offense of ABWIK and purposefully created the new offense of attempted murder, which includes a 'specific intent to kill' as an element" that was not required for ABWIK. 422 S.C. at 63–64, 810 S.E.2d 18, 26–27.

Taylor's argument about implied or inferred malice is drawn from a footnote in *King*. In footnote five, *King* suggested the General Assembly re-evaluate the statute's language because "the inclusion of the word 'implied' in section 16-3-29 is arguably inconsistent with a specific-intent crime." *Id*. at 64 n.5, 810 S.E.2d at 27 n.5. Taylor argues this language makes implied malice out-of-bounds. We disagree.

When our supreme court spoke of implied malice in *King*, it was speaking of malice implied by operation of law, not of the jury's ability to infer malice based on its view of certain facts. *King* cited *Keys v. State*, 766 P.2d 270 (Nev. 1988), for its holding that specific intent to kill is an essential element of attempted murder. *King*, 422 S.C. at 56–57, 810 S.E.2d at 23. *Keys* distinguished attempted murder from murder by defining "express malice" as a specific intent to kill and said "express malice" was "malice in fact." 766 P.2d at 272. "Implied malice," on the other hand, consisted of a "general malignant recklessness" rather than the specific intent to kill. *Id*. at 273. As *Keys* and *King* explain, malignant recklessness is a sufficient criminal intent for murder but not for attempted murder because the attempted murder statute explicitly requires "intent to kill." Recklessness is not enough.

If "implied malice" is used to describe mere "malignant recklessness," *King* plainly holds implied malice is inconsistent with and falls short of the bar for attempted

murder. Even so (and critically), nothing in *Keys*, *King*, or any other case prevents a jury from being charged that it can look at a defendant's actions and imply or infer from those actions that the defendant "in fact" had the specific intent to kill.

Here, the jury charges repeatedly emphasized that the jury could not convict Taylor without finding she specifically intended to kill the child. The judge gave the jury a general charge on "criminal intent." Then, the judge charged the language of the attempted murder statute. Next, the judge charged the jury on malice, but excluded any language about negligence or recklessness. Finally, the judge charged that attempted murder was a specific intent crime.

The judge charged the jury that malice could be expressed or inferred—but that those terms referred to the whether malice was proven by direct evidence or by the jury's inferences from other facts. The judge charged the jury that malice means hatred or ill will and that it could be inferred from conduct that shows a total disregard for human life. He also charged that specific intent to kill can be shown by acts and conduct from which someone would naturally and reasonably infer intent and that specific intent could be inferred from voluntary and willful actions that naturally tend to destroy another's life.

Abundant authorities support using inferences to find specific intent. *See, e.g., State v. Raglin*, 699 N.E.2d 482, 488 (Ohio 1998); *Williams v. Maggio*, 695 F.2d 119, 122 (5th Cir. 1983); 4 *Wharton's Criminal Law* § 695 (15th ed.); 41 C.J.S. *Homicide* § 283. Here, the judge charged malice in a way that complied with *King*, using language from both *King* and *Keys*.

To be fair, the first section of the general malice charge included language common in malice charges that malice includes intentionally doing a wrongful act without just cause or excuse, with an intent to inflict an injury, or "under circumstances that the law will infer an evil intent." Even so, there were no charges regarding the circumstances under which *the law* may imply malice. This was the only reference to malice implied by operation of law. The judge gave the jury multiple instructions that it could not find Taylor guilty unless it found she intended to kill the child. Thus, when taken in its entirety, we believe the charge was correct. *See Simmons*, 384 S.C. at 178, 682 S.E.2d at 36 ("In reviewing jury charges for error, this Court must consider the circuit court's jury charge as a whole in light of the evidence and issues presented at trial."); *see also State v. Burkhart*, 350 S.C. 252, 261, 565 S.E.2d 298, 302 (2002) ("A jury charge is correct if it contains the correct definition of the law when read as a whole.").

Taylor contends *State v. Shands* supports her argument that implied malice instructions do not belong in an attempted murder case. 424 S.C. 106, 817 S.E.2d 524 (Ct. App. 2018). There, the relevant issue was whether the trial court erred in instructing the jury that malice could be inferred from the use of a deadly weapon. *Id*. at 128, 817 S.E.2d at 535–36. This court wrote "malice can never be implied in an attempted murder case," and that attempted murder requires the State to prove the defendant "acted with express malice *and* the specific intent to kill." *Id*. at 130–31, 817 S.E.2d at 536–37.

As already noted, we understand "implied malice" as prohibited in *King* to mean malice implied by the law, not malice found by the jury based on the circumstances. Again, neither *King* nor any other case holds an intent to kill cannot be shown through circumstantial evidence, as Taylor seems to insist. *Shands* turned on this court's analysis of *State v. Belcher*, 385 S.C. 597, 685 S.E.2d 802 (2009), which has since been overruled by *State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019) (holding the charge that malice may be inferred from use of a deadly weapon is improper in all instances). Critically, no deadly weapon instruction was given here.

Finally, Taylor argues the court should not have allowed the solicitor to suggest during closing argument that the jury could find malice based upon Taylor's attempts to cover up the crime. The solicitor told the jury it could infer malice from Taylor's effort to cover up a crime and her intentional denials to police in the face of the evidence against her. Nothing suggests this argument was improper. Indeed, our supreme court has emphasized that parties are free to argue the existence or nonexistence of malice based on the evidence. *Burdette*, 427 S.C. at 503, 832 S.E.2d at 582–83.

**AFFIRMED.**[1]

**LOCKEMY, C.J., and HUFF, J., concur.**

---

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.