577 S.E.2d 493

**The STATE, Respondent,**

v.

**Pamela GRUBBS, Appellant.**

**No. 3599.**

Court of Appeals of South Carolina.

Heard Jan. 14, 2003.
Decided Feb. 18, 2003.
Rehearing Denied March 21, 2003.
Rehearing Denied April 25, 2003.

Assistant Appellate Defender Robert M. Dudek, of Columbia; for Appellant.

Attorney General Henry Dargan McMaster; Chief Deputy Attorney General John W. McIntosh; Assistant Deputy Attorney General Donald J. Zelenka; Assistant Attorney General Derrick K. McFarland, of Columbia; Solicitor Barbara R. Morgan, of Aiken; for Respondent.

CURETON, J.:

Pamela Grubbs appeals her murder conviction arguing she is entitled to a new trial because the circuit court erred in refusing to admit expert testimony regarding the battered spouse syndrome and in refusing to charge the jury the law of voluntary manslaughter. We reverse and remand for a new trial.

## FACTS

Grubbs and Clifford Smith lived together in a common law relationship. Grubbs admitted Smith intended to sever the relationship. Late on the evening of November 18, 1998, the Bamberg County Sheriff's Department received a call to respond to the couple's residence. The caller reported "a shooting and an intruder." When the police arrived, they found Smith dead on the sofa in the living room. Smith died as the result of five gunshot wounds to the right side of his body.

Grubbs made numerous conflicting statements regarding the events leading to Smith's death. In her first written statement made several hours after the incident, Grubbs stated Smith left the home in the early evening to find the title to a truck at work. Before Smith left, Grubbs told him she was afraid of being alone. Smith left Grubbs a portable telephone in the bedroom and told her he would call before returning home. After falling asleep in the bedroom, Grubbs stated she was awakened by the sound of the bedroom door opening and saw a person's shadow in the doorway. Grubbs said she shouted Smith's name and pulled a pistol from under

her pillow as the figure leaned over her as she lay in bed. The intruder did not respond and she shot him. Grubbs stated the intruder then ran into the living room where she fired the bullets remaining in the gun. Grubbs stated she then turned on the light and discovered the intruder was Smith. Grubbs stated the shooting occurred at 10:30 p.m. She called her brother and waited for him to arrive before calling the sheriff's department at 11:28 p.m.

During the investigation, Officer Tom Darnell concluded the physical evidence at the scene did not match Grubbs's story. Darnell testified the physical evidence indicated no gunshots were fired in the bedroom. Instead, all the wounds Smith received were consistent with being shot while lying on his side on the sofa.

In her next statement, Grubbs told the police she arrived home from work just before 5:00 p.m. on November 18th. Smith arrived home shortly thereafter and they argued about a truck title. Grubbs went to bed. Smith later entered the bedroom, hovered over the bed, and yelled at Grubbs. He then turned around and walked out. Grubbs followed with the gun, approached him, and shot him. In her final pretrial statement, Grubbs supplemented this statement stating that when Smith argued with her in the bedroom, he pushed her around and hit her in the eye.

At trial, Grubbs testified Smith argued with her about putting the title to her car in his name. When Grubbs refused to change the name on the title, Smith pushed her onto the couch and left the house. After she went to bed, she woke up when the bedroom door cracked open and a figure was on top of her and hit her in the stomach and eye. Grubbs testified she never saw the face of her attacker and could only identify the outline of his body. Grubbs testified that after being hit, she screamed and the figure ran into the living room. Grubbs retrieved her pistol and went into the living room. As Grubbs approached the couch, she stated the figure jumped at her and she fired the gun. Grubbs maintained throughout the trial that she did not know her attacker was Smith until she turned the lights on in the living room.

Grubbs was convicted and sentenced to thirty-five years imprisonment. She appeals.

## LAW/ANALYSIS

### I. Failure to admit expert testimony

Grubbs argues the trial court erred in refusing to admit the testimony of her expert witness regarding battered spouse syndrome. We agree.

Grubbs testified to numerous instances of physical and mental abuse perpetrated on her by Smith, including a physical altercation in 1997, after which Grubbs obtained an order of protection against Smith.

Grubbs sought to introduce the testimony of Dr. Lois Veronen. Veronen concluded Grubbs fit the profile of one suffering from battered spouse syndrome. Veronen also opined the syndrome could explain why Grubbs gave conflicting statements. During Veronen's *in camera* testimony, the following colloquy ensued:

[Defense]: [Are you] aware that Ms. Grubbs stated on numerous occasions during cross that this shooting was an accident and not really admitting or stating that she recognized Mr. Smith as being the abuser/ intruder[?]

[Veronen]: Correct.

[Defense]: Is that something—how does that play with being a—a victim of the battered woman's syndrome?

[Veronen]: Well, I think it plays very directly because her sense of self and her role as an actor has been so diminished in her relationship that she cannot say that she is defending herself. She has to make her intimate partner a stranger in order to defend herself. He cannot be Cliff whom she was fighting with. He has to be an intruder. The sense of having a right to defend herself against her partner's violence she has lost that in the process of this relationship.

Veronen testified further that women who suffer from battered spouse syndrome rarely disclose their abuse to others. The colloquy continued:

[Defense]: In this particular case, is it possible that during the initial questioning after this incident that [Grubbs] was still trying to protect [Smith].

[Veronen]: Well, trying to protect [Smith] but trying to protect the image of their relationship as well—that this was a loving relationship.

[Defense]: Could that possibly be the case almost two years later?

[Veronen]: In part, we see, you know, there's—there's cracks in it. There's some insight into the nature of this relationship, but it's not a full recognition of this relationship as being abusive.

[Defense]: So [Grubbs] could be still possibly protecting that image of the relationship on today.

[Veronen]: Correct.

The trial court refused to allow Veronen's testimony because it conflicted with Grubbs' own testimony at trial that she did not know her attacker at the time she fired the gun. The court stated: "If a defendant does not recognize the intruder as the abuser, then the defense does not apply ...." The court further explained:

[T]he jury would have to ignore the rationale expressed by [Grubbs] as she explained to this jury why she did not believe [Smith] to be her abuser and would have to supplant the testimony which it has heard under oath by ... [Grubbs] herself with the supposition of an opinion of that put forth by [Grubbs'] expert. I find that that would be an intrusion into the province of the jury. As I've said, [Grubbs] may very well be a battered woman, but under the facts of this case as testified to by [Grubbs] herself, those facts do not bear out the presentation of that defense or the expert testimony supporting it to this jury and the State's motion to suppress that line of testimony is therefore granted.

We find the trial court erred in excluding the testimony. Rule 702, SCRE, allows a party to present expert testimony to the finder of fact if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 702, SCRE. A trial court's decision to admit or exclude expert testimony will not be disturbed absent an abuse of discretion. *Mizell v. Glover*, 351 S.C. 392, 406, 570 S.E.2d 176, 183 (2002). A trial court's ruling on the admissibility of an expert's testimony constitutes an abuse of discretion where the ruling is manifestly arbitrary, unreasonable, or unfair. *Means v. Gates*, 348 S.C. 161, 166, 558 S.E.2d 921, 924 (Ct.App.2001).

The battered spouse syndrome was first recognized in South Carolina by our supreme court in *State v. Hill,* 287 S.C. 398, 339 S.E.2d 121 (1986). In *Hill,* the court held that expert testimony about battered spouse syndrome is admissible to establish a claim of self-defense in a homicide case. *Hill,* 287 S.C. at 399–400, 339 S.E.2d at 122. The court acknowledged the emerging trend in other jurisdictions that find "the testimony is relevant to the issue of self-defense and highly probative of the defendant's state of mind at the time of the incident." *Id.* at 400, 339 S.E.2d at 122. Therefore, "[i]f the jury accepted the [defendant's] version of what happened, that would make the proffered expert testimony not only relevant, but critical." *Id.* at 399–400, 339 S.E.2d at 122.

In *Robinson v. State,* the court examined the battered spouse syndrome in relation to the specific elements of self-defense in a homicide case. 308 S.C. 74, 417 S.E.2d 88 (1992). The court found "the unique perceptions of a defendant suffering from battered woman's syndrome are generally compatible with the law of this State regarding self-defense." *Id.* at 78, 417 S.E.2d at 91. The court concluded: "Our interpretation of the relationship between the battered woman's syndrome and self-defense is cursory, at best, and should not be construed as this Court's last word on the subject. Our law will continue to evolve as the scientific community's understanding of the battered woman's syndrome develops and society's comprehension of the condition becomes more sophisticated." *Id.* at 80, 417 S.E.2d at 92.

Furthermore, section 17–23–170 of the South Carolina Code governs the admissibility of expert testimony of the battered spouse syndrome:

(A) Evidence that the actor was suffering from the battered spouse syndrome is admissible in a criminal action on the issue of whether the actor lawfully acted in self-defense, defense of another, defense of necessity, or defense of duress. This section does not preclude the admission of testimony on battered spouse syndrome in other criminal actions.

S.C.Code Ann. § 17–23–170 (Supp.2001).

■ Grubbs's defense at trial was self-defense. In one of her pre-trial statements, Grubbs claimed Smith pushed her

and punched her in the eye. Grubbs also testified to a pattern of past abuse perpetrated by Smith. In closing arguments, Grubbs's counsel argued self-defense. The trial court charged the jury the law of self-defense. Precisely because Grubbs's trial testimony conflicted with her own defense, and the proffered expert testimony was relevant to explain this conflict, the jury was entitled to consider the testimony. *See State v. Knoten*, 347 S.C. 296, 306–09, 555 S.E.2d 391, 396–98 (2001) (finding a jury question existed regarding which of a defendant's conflicting statements to believe; thus, entitling defendant to a jury charge relevant to a pretrial, inconsistent statement). The jury needed the expert's testimony to assist it in evaluating Grubbs' state of mind at the time of the shooting. The expert offered testimony that Grubbs's conflicting statements resulted from the syndrome. Without the expert's testimony, the jury had no way of putting the differing versions of Grubbs' statements into context. We find Veronen's testimony was necessary to assist the jury in understanding the issues involved in the case, and the trial court erred in excluding the evidence.

## II. Voluntary Manslaughter Charge

Grubbs also argues the trial court erred in refusing to charge the jury the law of voluntary manslaughter. We agree.

At trial, the State argued Grubbs was not entitled to a jury charge on voluntary manslaughter because, through her trial testimony, she "disavowed herself of the manslaughter element . . . ." The trial court agreed finding that "a person charged with an offense [does not have] the right to submit various inconsistent theories of a defense and kind of throw them up on the wall to see what sticks . . . ."

The law to be charged must be determined from the evidence presented at trial. *Knoten*, 347 S.C. at 302, 555 S.E.2d at 394. When determining whether a defendant is entitled to a voluntary manslaughter charge, the court views the facts in the light most favorable to the defendant. *State v. Byrd*, 323 S.C. 319, 321, 474 S.E.2d 430, 431 (1996). Fighting is sufficient legal provocation to warrant giving a voluntary

manslaughter charge. *State v. Davis,* 278 S.C. 544, 546, 298 S.E.2d 778, 779 (1983).

Voluntary manslaughter is defined as:

[T]he unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation. Heat of passion alone will not suffice to reduce murder to voluntary manslaughter. Both heat of passion and sufficient legal provocation must be present at the time of the killing. The sudden heat of passion, upon sufficient legal provocation, which mitigates a felonious killing to manslaughter, while it need not dethrone reason entirely, or shut out knowledge and volition, must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence.

*State v. Cole,* 338 S.C. 97, 101–02, 525 S.E.2d 511, 513 (2000) (internal citations and quotations omitted).

In *Knoten,* Knoten was charged with numerous crimes including murder. 347 S.C. at 299, 555 S.E.2d at 393. Knoten gave several conflicting statements including one in which he claimed the victim armed herself with a knife, and threatened and cut Knoten. *Id.* at 301, 555 S.E.2d at 393–94. Knoten's conflicting statements were introduced at trial. *Id.* at 302, 555 S.E.2d at 394. Also at trial, Knoten recanted his statements, claiming a co-worker committed the murder. *Id.* at 301–02, 555 S.E.2d at 393–94.

The trial court refused to charge the jury the law of voluntary manslaughter. *Id.* Our supreme court reversed finding the jury could have believed Knoten's statement claiming the victim threatened and cut him. *Id.* at 306–09, 555 S.E.2d at 396–98. Notwithstanding the conflicting statements, the court concluded Knoten was entitled to a charge of voluntary manslaughter because one of his statements asserted facts entitling him to the charge. *Id.* at 305–06, 555 S.E.2d at 398.

We likewise find Grubbs's inconsistent statements do not negate her right to a charge of voluntary manslaughter where one of her statements asserted facts entitling her to the charge. Because a jury could believe the facts as represented

by Grubbs in her statement alleging Smith pushed her and punched her in the eye, and in light of the testimony of long term abuse of Grubbs by Smith, a charge on voluntary manslaughter was appropriate. Thus, the trial court erred by failing to charge voluntary manslaughter to the jury.

## CONCLUSION

We find the trial court erred in refusing to admit the expert testimony regarding battered spouse syndrome. We likewise find the trial court erred in refusing to charge the jury the law of voluntary manslaughter. Accordingly, Grubbs's conviction is reversed and the case is remanded for a new trial.

**REVERSED AND REMANDED.**

HEARN, C.J., and ANDERSON, J., concur.