LOCKEMY, C.J.:
**528 Suzanna Simpson appeals her convictions for murder, attempted murder, and possession of a weapon during the commission of a violent crime. Simpson argues the trial court erred in (1) admitting forensic expert testimony, (2) excluding expert testimony, and (3) denying her motion for a directed verdict. We affirm.
FACTS/PROCEDURAL BACKGROUND
On May 14, 2013, a neighbor of Suzanna and Michael Simpson heard a noise in his yard and found Suzanna Simpson's truck in a ditch near some downed trees. When the neighbor approached the truck, Simpson told him her back hurt. The neighbor repeatedly asked Simpson where her husband and children were, and Simpson only responded "I don't know" and "Am I going to be okay?" According to the neighbor, Simpson was coherent, and he had no trouble communicating with her.
*233 **529 Simpson was transported to the hospital for treatment. According to a nurse who treated Simpson, Simpson told him, "I shot my husband and kids ... [a]nd then I had an accident." When the nurse asked Simpson why she shot her family, she responded, "because it's an awful world." When the nurse asked why Simpson did not kill herself instead, she replied, "I thought about it and tried, but I couldn't do it." According to the nurse, Simpson was alert, knew where she was, and spoke clearly. Simpson refused to talk to the police at the hospital.
While Simpson was receiving treatment, police went to the Simpson home and found the bodies of Simpson's five-year-old son and seven-year-old daughter in their bedrooms, both with gunshots to the head. Michael Simpson was also shot and found still breathing on the floor of the master bedroom. Police later found a .40 caliber handgun at the scene of Simpson's wreck.
In February 2014, Simpson was indicted by the Pickens County Grand Jury for two counts of murder, one count of attempted murder, and possession of a weapon during the commission of a violent crime. A jury trial was held on June 20-23, 2016.
During pre-trial motions, Simpson moved for a directed verdict, arguing that after she informed the State she intended to plead not guilty by reason of insanity, the State was required to put her on notice of any expert witnesses to rebut her insanity claim. Because the State had not given Simpson notice of its intention to call an expert witness, she argued the State would not meet its burden of proof. The State argued the motion for a directed verdict was not appropriate as a pre-trial motion because the defense of insanity is an affirmative defense requiring Simpson to present some evidence. The State also asserted it was not obligated to give Simpson notice of an expert witness and an expert witness was not required to combat the affirmative defense of insanity. The trial court denied Simpson's motion for a directed verdict.
Simpson also sought to limit the opinion testimony of lay witnesses, again arguing the State could not prove she was sane without expert testimony. The State countered they could prove their case with lay witnesses. The trial court denied **530 Simpson's motion. Simpson then asserted the State could not prove through lay witnesses that she had a mental impairment, and, thus, could not conform her conduct to the requirements of the law. The trial court denied Simpson's motion to limit witness testimony.
Simpson next moved to bar the testimony of her treating psychiatrist, Dr. Jeff Smith. Simpson's expert witnesses had consulted Dr. Smith and he was a known witness. The State informed the court it might ask to qualify Dr. Smith as an expert in psychiatry, but it was not sure how it would use his testimony. The trial court decided to rule on any objections to the testimony at the appropriate time.
During trial, several witnesses testified as to Simpson's behavior leading up to the shootings. Nathan Stegall, a friend of the Simpsons, testified he visited the Simpson's home the day before the shootings. Stegall testified that while he waited for Michael, Simpson seemed angry. Stegall believed Simpson and her husband were arguing. Later that evening, Stegall received a text message from Simpson that read, "Hell on earth?"
At Simpson's children's school, another parent testified he saw Simpson in the school office the day before the shootings. The parent observed Simpson withdrawing her daughter from school. When asked for the reason, Simpson said she was picking up her daughter because her son was sick, and she was afraid her daughter might also be sick. Simpson's son, who was with her, said, "I'm not sick, Mom." The parent observed Simpson pacing back and forth and growing impatient while waiting for her daughter. When the parent suggested Simpson's daughter was likely collecting her backpack, Simpson replied "Where she's going to go, she don't need no backpack." Simpson also appeared angry and snapped at the parent as she left the building with her children.
Simpson's mother-in-law, Allison, testified regarding a conversation the night before the shootings in which Simpson asked her why her mother-in-law and father-in-law did not *234 come to visit and help with the kids more often. Allison also recalled another conversation with Simpson the previous year following Simpson's release from a behavioral care center. After Simpson was discharged, Michael left on a hunting trip, **531 and Simpson called Allison asking if she thought Michael would return home to his family.
Simpson's mother, Susan, testified Simpson called her the day before the shootings and asked her if her parents really wanted her. Later that day, Simpson called again and asked her mother if various relatives who were deceased were better off in heaven. In another call, Simpson spoke to Susan about the evils of the world and how you could not protect your children from those evils. When Simpson called again that evening, Susan testified Simpson sounded happy, saying she and her husband were going to seek marital counseling. Later that evening, however, Simpson called Susan again and said, "Mike's through with me. He thinks I can't take care of the children." When Susan pressed her for details, Simpson said Michael told her she stares into space all the time. Susan also testified Simpson had what appeared to be a psychotic episode in 2012. Simpson was hospitalized for five days after this episode and was then transferred to a behavioral health center where she remained for three days. Susan recalled several instances in which her daughter told her she believed the family was being watched.
At the close of the State's case, Simpson renewed her motion for a directed verdict, arguing the State had failed to give the defense notice of their intent to call an expert witness. The State argued the law presumes the defendant is sane and an affirmative defense requires the defense to prove by a preponderance of the evidence that Simpson was insane at the time of the shootings. The trial court asked the State if it intended to call an expert witness, and the State said it could not be sure without knowing how Simpson would present her case, but if it did call a witness, it would be Dr. Smith. The trial court again denied Simpson's motion for a directed verdict.
Simpson presented three expert witnesses at trial. Dr. Leonard Mulbry testified he met with Simpson three times after the shootings and examined her medical records. Dr. Mulbry diagnosed Simpson with schizoaffective disorder bipolar type. Dr. Mulbry outlined her medical treatment in the years before the shooting, beginning with mild depression in college, followed by episodes of post-partum depression. He **532 further noted that in 2010 Simpson began seeing Dr. Smith who treated Simpson with several medications in an effort to control her symptoms. After a review of Simpson's medical records and Dr. Smith's notes, Dr. Mulbry explained that Simpson's moods cycled through depression, sleeplessness, confusion, and paranoia. Dr. Mulbry opined Simpson was unable to distinguish legal and moral right from wrong at the time of the shootings.
On cross examination, Dr. Mulbry testified he examined Simpson nine months after the shootings. Dr. Mulbry also acknowledged he never consulted with Dr. Smith and relied only on Dr. Smith's notes in forming his opinion. Dr. Mulbry noted that after Simpson received treatment for her bipolar disorder at the treatment facility in 2012, her mood improved, she had no hallucinations or homicidal thoughts, and she didn't mention any concerns for her children. Dr. Mulbry also noted Simpson had not been diagnosed with schizoaffective disorder prior to the shootings. Dr. Mulbry admitted that during the period he believed Simpson suffered from schizoaffective disorder in the hours before the shooting, he could not opine whether Simpson knew right from wrong when she spoke to the officials at the children's school, interacted with Nate Stegall and her neighbor, and had several conversations with her mother and mother-in-law.
Simpson's second expert witness, Dr. David Price, evaluated Simpson by meeting with her and Dr. Smith and reviewing Simpson's extensive medical records. Dr. Price also diagnosed Simpson with schizoaffective disorder bipolar type and opined Simpson was not able to distinguish between right and wrong at the time of the shootings. Dr. Price testified there was "no question" about Simpson's psychosis, delusions, and paranoia on the night of the shootings. Dr. Price testified Dr. Smith agreed with his *235 opinion, and the State objected based on hearsay. The trial court sustained the objection.
Dr. Richard Frierson, a court appointed psychiatrist, also diagnosed Simpson with schizoaffective disorder bipolar type. Dr. Frierson testified Simpson suffered from episodes of mania, depression, and delusional or paranoid thinking. Dr. Frierson opined Simpson could not distinguish right from wrong at the time of the shootings.
**533 At the conclusion of the defense's case, the State informed the court it sought to call Dr. Smith as a reply witness. Simpson renewed her motion for a directed verdict, arguing the State was not entitled to present a rebuttal witness because her due process rights were violated when the State did not present evidence of her sanity beyond a reasonable doubt in its case-in-chief. Simpson further argued she did not consent to Dr. Smith's testimony, nor had she waived her physician/client privilege. The State argued Simpson waived her privilege in accordance with section 44-22-90 of the South Carolina Code (2018) when she released her medical records to her retained experts. The State also argued it was entitled to call Dr. Smith pursuant to Rules 703 and 705, SCRE, because Simpson's experts relied on Dr. Smith's treatment of Simpson in forming their opinions about her diagnosis. The State said Dr. Smith would be qualified as a psychiatrist and as a fact witness to his treatment of Simpson in the years prior to the shootings. The State informed the court it also expected Dr. Smith to explain that Simpson's remediation within forty-eight hours of the shootings was atypical, and that he would not expect to see that in a patient with a true psychosis.
Simpson argued Dr. Smith should not be permitted to testify whether she knew right from wrong or could conform her behavior. The trial court replied, "Because you say he's not qualified to because he's not a forensic psychiatrist." The court informed Simpson it would make that determination after voir dire. The following day, the State argued Dr. Smith was qualified to testify about Simpson's ability to conform her behavior to the requirements of the law because of his qualifications as a psychiatrist. The State argued any distinction between a treating psychiatrist and a certified forensic psychiatrist would be a matter of weight for the jury to determine. Simpson countered that it would be unethical for the State to call a treating physician to testify "in a forensic manner against his own patient."
The trial court issued several rulings. First, the court found the State was entitled to present reply evidence. The trial court also found Simpson waived her privileged medical information because she released her records to three defense experts. The trial court further ruled it would allow Dr. Smith **534 to testify and he would likely be qualified as an expert in psychiatry, and the court would make its determination of his qualifications as set forth in State v. Council[1] . The trial court found it was within the purview of the jury to weigh the credibility of the expert's opinion on the matter.
Dr. Smith began treating Simpson in March of 2010. Over the course of his treatment, he saw Simpson as a patient thirty-four times. According to Dr. Smith, Simpson's condition appeared stable at times over the years, and at other times Dr. Smith would adjust her medications to treat her three conditions: bipolar disorder, attention deficit disorder (ADD), and anxiety. Dr. Smith testified these three conditions were "tricky" to manage because the medications for ADD could enhance the symptoms of bipolar disorder if the patient were not taking the mood stabilizer to manage the mood disorder. In fact, in one of three instances in which Simpson admitted having paranoia, she also told Dr. Smith she had stopped taking her mood stabilizer. Dr. Smith stated Simpson's decision to continue taking the stimulant medication for ADD without the stabilizer would significantly contribute to her psychosis.
Dr. Smith reviewed the report of Dr. Frierson and spoke to Dr. Price. Dr. Smith testified he told Dr. Price that Simpson presented entirely differently in the thirty-four visits with Dr. Smith than she did during *236 their evaluation. Dr. Smith stated he told Dr. Frierson, "it was like we were talking about two different individuals." Dr. Smith explained Simpson only complained vaguely of paranoid thoughts along the lines of "I think people are talking about me." Dr. Smith testified the delusions reported by Simpson and her family were never mentioned to him during the course of his treatment. Dr. Smith noted the hospital records from the treating emergency room psychiatrist, who saw Simpson directly after the shootings, did not indicate Simpson wanted to kill herself or heard any voices. Further, the emergency room psychiatrist's description of Simpson's psychosis was not nearly as severe as the forensic psychiatrists' reports. Dr. Smith believed Simpson's rapid resolution of symptoms, both during the earlier admission and during the treatment after the shootings, **535 was an unusual response to a functional psychosis. Dr. Smith testified that typically a functional psychosis such as schizophrenia, bipolar disorder with psychosis, or depression with psychosis would not react that quickly and positively to medication.
Dr. Smith also found it unusual for Simpson's statements to her mother the day before the shootings to sound normal in one call and psychotic in another. Dr. Smith stated it would be unusual for someone who is psychotic to come in and out of psychosis throughout the day. Dr. Smith also pointed out Simpson's comment about her husband being "done with her" and her decision to withdraw the children from school indicated some organized planning on her part. Dr. Smith opined Simpson knew right from wrong at the time of the shootings.
At the conclusion of trial, the jury returned a verdict of guilty on all charges and the court sentenced Simpson to consecutive life sentences for the two counts of murder, a consecutive term of thirty years' imprisonment for attempted murder, and a consecutive term of five years' imprisonment for possession of a weapon during the commission of a violent crime.
STANDARD OF REVIEW
"In criminal cases, the appellate court sits to review errors of law only." State v. Jenkins , 412 S.C. 643, 650, 773 S.E.2d 906, 909 (2015).
LAW/ANALYSIS
I. Dr. Smith
A. Qualification of Dr. Smith
Simpson argues the trial court erred in allowing Dr. Smith to give forensic testimony and offer his opinion on sanity where he was not qualified as an expert in forensic psychiatry. We disagree.
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
**536 Rule 702, SCRE. However, "[b]efore a witness is qualified as an expert, the trial court must find (1) the expert's testimony will assist the trier of fact, (2) the expert possesses the requisite knowledge, skill, experience, training, or education, and (3) ... the expert's testimony is reliable." State v. Martin , 391 S.C. 508, 513, 706 S.E.2d 40, 42 (Ct. App. 2011). "The qualification of a witness as an expert is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion." Id. "An abuse of discretion occurs when the trial court's ruling is based on an error of law or a factual conclusion that is without evidentiary support." State v. Price , 368 S.C. 494, 498, 629 S.E.2d 363, 365 (2006). While an expert's qualification generally goes to weight of his testimony and not its admissibility, the trial court acts as a gatekeeper in vetting its reliability and deeming the testimony admissible. Graves v. CAS Med. Sys., Inc. , 401 S.C. 63, 74, 735 S.E.2d 650, 655 (2012).
Here, the trial court qualified Dr. Smith as an expert in psychiatry. On appeal, Simpson argues the determination as to whether she knew right from wrong at the time of the shootings is a determination that can only be made by experts qualified in forensic psychiatry. Simpson contends that while Dr. Smith was qualified to testify as to her condition during his treatment, he was not qualified to testify as to his forensic opinion of her condition *237 at the time of the shootings. Simpson argues Dr. Smith's opinion was based on a review of the case, including records previously unseen by Dr. Smith; thus, Dr. Smith prepared for and testified to his opinions based on a forensic evaluation of the case.
We find the trial court did not abuse its discretion in qualifying Dr. Smith as an expert in psychiatry and allowing him to testify as to Simpson's ability to distinguish between right and wrong. First, we note Simpson failed to cite any case law supporting her argument that only a forensic expert can testify as to whether a defendant knew right from wrong at the time of the crime. Moreover, in the case of an affirmative defense of insanity, the jury decides whether the defendant knew right from wrong based on either the testimony of lay witnesses or expert witnesses or both. See State v. Lewis , 328 S.C. 273, 278, 494 S.E.2d 115, 117 (1997).
**537 In addition, we find Dr. Smith, as Simpson's treating psychiatrist, was qualified to opine as to Simpson's mental capacity. At the time of trial, Dr. Smith had practiced psychiatry for twenty-six years and been deposed "hundreds of times" in civil cases. He also completed a rotation in forensic psychiatry during his residency. Dr. Smith has offered his opinion on a patient's criminal responsibility on five occasions and rendered an opinion on his patients' ability to conform their behavior on multiple occasions. Not only was Dr. Smith qualified to opine on Simpson's mental capacity, he also had the most direct and most recent interaction with Simpson in relation to the shootings. Dr. Smith saw Simpson thirty-four times over a three-year-period, including a visit three months before the shootings. In contrast, Dr. Mulbry examined Simpson nine months after the shootings, Dr. Price examined her one year later, and Dr. Frierson began his evaluation almost two years after the shootings.
B. Admission of Dr. Smith's Testimony
Simpson argues the trial court erred in admitting Dr. Smith's testimony. Specifically, Simpson contends the court erred in admitting testimony: (1) despite discovery violations under Rule 5, SCRCrimP, and Brady v. Maryland[2] ; (2) based on evidence obtained in violation of state and federal privacy laws; and (3) based on evidence obtained as a result of an unlawful seizure under the Fourth Amendment. We disagree.
"Generally, the admission of expert testimony is a matter within the sound discretion of the trial court." State v. Cope , 405 S.C. 317, 343, 748 S.E.2d 194, 208 (2013) (quoting State v. Whaley , 305 S.C. 138, 143, 406 S.E.2d 369, 372 (1991) ). This court will not disturb the trial court's admissibility determinations absent a prejudicial abuse of discretion. State v. Adkins , 353 S.C. 312, 326, 577 S.E.2d 460, 468 (Ct. App. 2003). "An abuse of discretion arises from an error of law or a factual conclusion that is without evidentiary support." State v. Irick , 344 S.C. 460, 464, 545 S.E.2d 282, 284 (2001). "A trial court's ruling on the admissibility of an expert's testimony constitutes an abuse of discretion whe[n] the ruling is manifestly arbitrary, unreasonable, or unfair."
**538 State v. Grubbs , 353 S.C. 374, 379, 577 S.E.2d 493, 496 (Ct. App. 2003). To show prejudice, the appellant must demonstrate "a reasonable probability the jury's verdict was influenced by the challenged evidence or the lack thereof." Fields v. Reg'l Med. Ctr. Orangeburg , 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005).
1. Rule 5, SCRCrimP, and Brady
Simpson argues the trial court erred in allowing Dr. Smith's testimony despite discovery violations under Rule 5, SCRCrimP, and Brady . We disagree.
Pursuant to Rule 5(a)(1)(D), SCRCrimP,
Upon request of a defendant the prosecution shall permit the defendant to inspect and copy any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the prosecution, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the prosecution, and which are material to the preparation of the defense *238 or are intended for use by the prosecution as evidence in chief at the trial.
"The Brady disclosure rule requires the prosecution to provide the defendant with any evidence in the prosecution's possession that may be favorable to the accused and material to guilt or punishment." State v. Anderson , 407 S.C. 278, 286, 754 S.E.2d 905, 909 (Ct. App. 2014). "[A]n individual asserting a Brady violation must demonstrate the evidence was (1) favorable to the accused; (2) in the possession of or known by the prosecution; (3) suppressed by the State; and (4) material to the accused's guilt or innocence, or [impeachment evidence]." Id. at 287, 754 S.E.2d at 909. "Impeachment or exculpatory evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." State v. Von Dohlen , 322 S.C. 234, 241, 471 S.E.2d 689, 693 (1996).
Simpson's medical records were central to her defense of insanity. Shortly after trial counsel was appointed to represent Simpson, she signed a HIPAA release authorizing the release of her medical records. Simpson's records were then disclosed **539 to the defense experts and the court appointed psychiatrist to aid in the formation of their opinions.
We disagree with Simpson's argument that the State violated Rule 5 and Brady by failing to disclose the records as the basis for Dr. Smith's opinion when the documents were in the possession of the defense and submitted to the defense experts. Simpson contends the State was required to disclose the basis of Dr. Smith's opinion, pursuant to Rule 5 and Brady , but the law does not support this contention. Rule 5 does not obligate the solicitor to notify the defendant of the substance of an expert's testimony that has not been put in the form of a written report, particularly when the expert is relying on information within the defendant's possession.
2. Privacy Laws
Simpson argues the trial court erred in admitting Dr. Smith's testimony based on evidence obtained by SLED in violation of state and federal privacy laws. We disagree.
Pursuant to the record: (1) SLED submitted a form requesting medical information from Simpson's medical providers; (2) the form cited an inapplicable state statute[3] ; and (3) the State was unaware of the form submitted by SLED. Simpson did not request a suppression hearing, no records custodians from the medical providers testified about when the documents were disclosed, and no representative from SLED testified about how the information ultimately came into its possession. The trial court did not make a finding as to how SLED retrieved Simpson's records. However, the trial court did find Simpson waived her privilege to protect her medical records by disclosing the information to her own experts, then calling those experts to testify to the contents at trial.
We agree with the trial court's finding that Simpson waived her privacy interest in her medical records when she consented to the disclosure of her records to her own experts and opened the door to her mental health by raising the defense of **540 insanity. Because Simpson waived her claim of privilege in her records, her argument SLED obtained her records improperly had no bearing on the issue before the trial court.
Furthermore, Simpson cannot demonstrate any prejudice from the trial court's decision to allow Dr. Smith's testimony based on her medical records. Simpson called three expert witnesses to testify as to their opinions of her mental health after reviewing her records from Dr. Smith. These experts explained to the jury the portions of Dr. Smith's records they found relevant to their opinions. Simpson cannot show Dr. Smith revealed information to the jury that was not previously revealed through the defense experts.
*239 3. Fourth Amendment
Simpson argues the trial court erred in admitting Dr. Smith's testimony because it was based on evidence obtained as a result of an unlawful seizure under the Fourth Amendment. We disagree.
The Fourth Amendment provides no remedy for a violation of the warrant requirement, but the United States Supreme Court fashioned the exclusionary rule, a deterrent sanction whereby the State is barred from introducing evidence obtained in violation of the Fourth Amendment. Davis v. United States , 564 U.S. 229, 237, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011). A Fourth Amendment seizure "deprives the individual of dominion over his or her person or property." State v. Wright , 391 S.C. 436, 442, 706 S.E.2d 324, 327 (2011) (quoting Horton v. California , 496 U.S. 128, 133, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) ). However, "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means, ... then the deterrence rationale has so little basis that the evidence should be received." Nix v. Williams , 467 U.S. 431, 432, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).
Simpson argues Dr. Smith's testimony should have been excluded because SLED violated her Fourth Amendment rights. The trial court declined to make a finding that Simpson's medical records obtained by SLED were a search or seizure in violation of Simpson's Fourth Amendment rights.
**541 As discussed above, the State was entitled to Simpson's medical records, and was entitled to call Dr. Smith as a reply witness. At trial, Simpson did not request, nor did the trial court conduct, a suppression hearing on her medical records. Simpson does not object to the disclosure of the information in her medical records to expert witnesses. Nor does she object to the information in her medical records being presented to the jury. Instead, Simpson seeks to suppress Dr. Smith's opinion on the basis of her records. We find Simpson's Fourth Amendment violation claim is not supported by the record or an appropriate claim of exclusion to Dr. Smith's testimony.
II. Dr. Price
Simpson argues the trial court erred in excluding Dr. Price's testimony regarding statements made to Dr. Price by Dr. Smith. We disagree.
" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), SCRE. "[I]t is well-settled that an exception to the rule prohibiting hearsay exists when it is used by an expert." State v. Hutto , 325 S.C. 221, 481 S.E.2d 432, 433 (1997). "An expert may base his opinion on hearsay evidence so long as it is of a type reasonably relied upon by other experts in the field." Id.
Dr. Price testified Dr. Smith agreed with his opinion that Simpson was not able to differentiate between right and wrong at the time of the shootings. The State objected based on hearsay and the trial court sustained the objection. On appeal, Simpson argues an expert witness may testify as to matters of hearsay for the purpose of showing what information he or she relied upon in giving an opinion of value.
We find the trial court did not err in excluding Dr. Price's testimony. Dr. Price testified Dr. Smith agreed with his opinion, which necessarily indicates Dr. Price formed his opinion before Dr. Smith agreed with it. Dr. Price's testimony was an impermissible attempt to bolster his credibility before the jury, and did not fit within the hearsay exception for expert testimony.[4] See **542 State v. McKerley , 397 S.C. 461, 464, 725 S.E.2d 139, 141 (Ct. App. 2012) (holding a witness is not permitted to vouch for the credibility of another witness by offering testimony that bolsters the testimony of another witness). *240 III. Directed Verdict
Simpson contends the trial court erred in denying her motion for a directed verdict, arguing the State failed to present sufficient evidence tending to prove her guilt. We disagree.
"When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." State v. Weston , 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). "A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged." Id. "On appeal from the denial of a directed verdict in a criminal case, an appellate court must view the evidence in the light most favorable to the State." State v. Stanley , 365 S.C. 24, 41, 615 S.E.2d 455, 464 (Ct. App. 2005). "If there is any direct or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find that the issues were properly submitted to the jury." State v. Mollison , 319 S.C. 41, 46, 459 S.E.2d 88, 91 (Ct. App. 1995).
Pursuant to section 17-24-10(A) of the South Carolina Code (2014),
It is an affirmative defense to a prosecution for a crime that, at the time of the commission of the act constituting the offense, the defendant, as a result of mental disease or defect, lacked the capacity to distinguish moral or legal right from moral or legal wrong or to recognize the particular act charged as morally or legally wrong.
However,
[a] defendant is guilty but mentally ill if, at the time of the commission of the act constituting the offense, he had the capacity to distinguish right from wrong or to recognize his act as being wrong as defined in Section 17-24-10(A), but because of mental disease or defect he lacked sufficient **543 capacity to conform his conduct to the requirements of the law.
S.C. Code Ann. § 17-24-20(A) (2014).
Viewing the evidence in the light most favorable to the State, we find a jury could reasonably deduce Simpson was capable of recognizing her actions as morally or legally wrong. Although Simpson's three experts opined she was unable to distinguish between right and wrong at the time of the shootings, Simpson's treating psychiatrist Dr. Smith testified she was capable of distinguishing between right and wrong. Additionally, several lay witnesses testified as to Simpson's behavior around the time of the shootings. The following evidence was introduced from which a jury could conclude Simpson understood right from wrong: (1) Simpson removed her children from school and lied as to the reason; (2) Simpson appeared irritated with her husband and children the day before the shootings; (3) Simpson turned off the home's alarm system before the shootings; and (4) Simpson refused to tell her neighbor or the police about the whereabouts of her family.
Although Simpson's experts opined she did not know right from wrong at the time of the shootings, the jury was not required to give the expert testimony greater weight than that of the lay witnesses. See State v. Douglas , 380 S.C. 499, 503, 671 S.E.2d 606, 609 (2009) (holding the fact that a witness was qualified as an expert did not require the jury to accord her testimony any greater weight than that given to any other witness). Accordingly, the trial court did not err in denying Simpson's motion for a directed verdict.
CONCLUSION
Simpson's convictions are
AFFIRMED.
THOMAS and GEATHERS, JJ., concur.

335 S.C. 1, 515 S.E.2d 508 (1999).

373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

SLED is authorized to "expeditiously investigate child deaths in all counties of the State" in accordance with section 63-11-1940 of the South Carolina Code (2010). In addition, section 63-11-1960 of the South Carolina Code (2010) authorizes SLED to obtain the medical records of a child whose death is being reviewed by the department. Here, SLED requested Simpson's records, not the children's.

We note Simpson did not attempt to enter Dr. Smith's statement to Dr. Price pursuant to Rule 613(b), SCRE.