# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Tyrone Anthony Wallace Jr., Petitioner.

Appellate Case No. 2021-000332

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Beaufort County
Carmen T. Mullen, Circuit Court Judge

---

Opinion No. 28175
Heard April 5, 2022 – Filed August 30, 2023

---

### AFFIRMED

---

Appellate Defender Susan Barber Hackett, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Senior Assistant Deputy Attorney General Melody Jane Brown, W. Jeffrey Young, and William Joseph Maye, of Columbia; Isaac McDuffie Stone III, of Bluffton, all for Respondent.

---

**JUSTICE FEW:** Tyrone Anthony Wallace Jr. appealed his convictions for murder and kidnapping, challenging the trial court's ruling that a witness who placed Wallace's phone near the two crime scenes based on cell site location information

(CSLI)[1] was "qualified as an expert by knowledge, skill, experience, training, or education" under Rule 702 of the South Carolina Rules of Evidence. The court of appeals affirmed. We granted Wallace's petition for a writ of certiorari to address only this issue. We find the trial court acted within its discretion. We affirm.

## I.        Facts and Procedural History

On October 25, 2015, Andre Frazier went to a house on Greene Street in the City of Beaufort looking for his friend Vermone Steve, whom everyone called Mony. Mony lived at the Greene Street house with Varsheen Smith. At the house, Frazier found only Wallace and Smith. Wallace and Smith tied up Frazier and held him at gunpoint. They released Frazier a few minutes later when they learned police officers were in the area on an unrelated call. Frazier left Greene Street without immediately speaking to the officers. Three days later, a Beaufort police investigator interviewed Frazier about Mony's disappearance. Frazier told the investigator Wallace and Smith tied him up at gunpoint. On November 18, Beaufort County Sheriff's deputies discovered remains of Mony's body near Pea Patch Road on Saint Helena Island in Beaufort County.

At trial, the State presented evidence Wallace waited for Mony at the Greene Street house, and shot and killed Mony when he arrived not long after he and Smith kidnapped and released Frazier. The State also presented evidence Wallace and three other men took Mony's body to the Pea Patch Road location and attempted to burn it using gasoline. Wallace eventually admitted to being present during Frazier's kidnapping and Mony's murder.

The State called an investigator in the Solicitor's office named Dylan Hightower as an expert witness. Hightower used CSLI to create a map showing Wallace's cell phone was near the Greene Street house and then traveled to and from the Pea Patch

---

[1] CSLI can be used to track the general location of a cell phone. As the Supreme Court of the United States recently explained, "Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI). The precision of this information depends on the size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area." *Carpenter v. United States*, 585 U.S. ___, ___, 138 S. Ct. 2206, 2211, 201 L. Ed. 2d 507, 515 (2018).

Road area at specific times on the night of the murder and early the following morning. The State proposed to have Hightower testify—using the map—Wallace's phone connected to four cell towers during the trip, two in particular: one 327 yards from the Greene Street house and the other 2.67 miles from the Pea Patch Road location.

The trial court conducted a lengthy pre-trial hearing and ruled Hightower was qualified as an expert under Rule 702. The jury found Wallace guilty of murder and kidnapping, and the trial court sentenced him to life in prison for murder and twenty-five years for kidnapping. The court of appeals affirmed. *State v. Wallace*, Op. No. 2021-UP-029 (S.C. Ct. App. filed Jan. 27, 2021).

## II. Standard of Review

We review a trial court's ruling on the admission or exclusion of evidence—when the ruling is based on the South Carolina Rules of Evidence—under an abuse of discretion standard. *See, e.g.*, *State v. Phillips*, 430 S.C. 319, 340, 844 S.E.2d 651, 662 (2020) (citing *State v. Dickerson*, 395 S.C. 101, 116, 716 S.E.2d 895, 903 (2011)); *State v. Council*, 335 S.C. 1, 21, 515 S.E.2d 508, 518 (1999) (citing *State v. Von Dohlen*, 322 S.C. 234, 248, 471 S.E.2d 689, 697 (1996)). We will not reverse a trial court's ruling on an evidence question unless we find the court abused its discretion, or—recognizing the term "abuse of discretion" can be a bit harsh[2]—unless we find the trial court has not acted within the discretion we grant to trial courts. *State v. Williams*, 430 S.C. 136, 149, 844 S.E.2d 57, 64 (2020). In most cases, we have stated a trial court acts outside of its discretion when the ruling is not supported by the evidence or is controlled by an error of law. *See, e.g.*, *State v. Jones*, 423 S.C. 631, 636, 817 S.E.2d 268, 270 (2018) ("A trial court's ruling on the admissibility of expert testimony constitutes an abuse of discretion where the ruling is unsupported by the evidence or controlled by an error of law.").[3] We have also

---

[2] *See Barrett v. Broad River Power Co.*, 146 S.C. 85, 96, 143 S.E. 650, 654 (1928) (calling the phrase "abuse of discretion" an "old unfortunate statement" and clarifying that the phrase "does not mean any reflection upon the presiding Judge, and it is a strict legal term, to indicate that the appellate Court is simply of the opinion that there was commission of an error of law in the circumstances").

[3] In some cases, this Court and our court of appeals have misstated when a trial court has not acted within its discretion as to expert testimony. *See, e.g.*, *State v. Cope*, 405 S.C. 317, 344, 748 S.E.2d 194, 208 (2013) ("A trial court's ruling on the admissibility of an expert's testimony constitutes an abuse of discretion where the

stated that a trial court's failure to exercise its discretion as to the admissibility of evidence is itself an abuse of discretion. *See State v. King*, 422 S.C. 47, 68-69, 810 S.E.2d 18, 29 (2017) (holding the trial court's refusal to listen to the disputed phone call recording left the court unable to carry out the required balancing under Rule 403, SCRE); 422 S.C. at 71, 810 S.E.2d at 31 (Kittredge, J., concurring) ("agree[ing] with the majority that the trial court abused its discretion in admitting the . . . telephone call recording").

Our statements in cases like *Jones* and *King* mean the trial court—when ruling on the admission or exclusion of evidence—must think through the objection that has been made, the arguments of the attorneys, and the law—particularly the applicable evidentiary rules—and must thoughtfully apply the correct law to the information and evidence before it. We recently discussed the thought process inherent in the exercise of discretion in *Morris v. BB&T Corp.*, 438 S.C. 582, 587, 885 S.E.2d 394,

---

ruling is manifestly arbitrary, unreasonable, or unfair." (quoting *State v. Grubbs*, 353 S.C. 374, 379, 577 S.E.2d 493, 496 (Ct. App. 2003))); *Fields v. Reg'l Med. Ctr. Orangeburg*, 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005) (same) (citing *Means v. Gates*, 348 S.C. 161, 166, 558 S.E.2d 921, 924 (Ct. App. 2001)); *Ray v. City of Rock Hill*, 428 S.C. 358, 369, 834 S.E.2d 464, 470 (Ct. App. 2019) (same) (citation omitted), *aff'd as modified*, 434 S.C. 39, 862 S.E.2d 259 (2021); *State v. Simpson*, 425 S.C. 522, 537-38, 823 S.E.2d 229, 237 (Ct. App. 2019) (same) (citation omitted); *State v. Jones*, 417 S.C. 319, 327, 790 S.E.2d 17, 21 (Ct. App. 2016) (same) (citation omitted), *aff'd as modified*, 423 S.C. at 636, 817 S.E.2d at 270; *Duncan v. Ford Motor Co.*, 385 S.C. 119, 131, 682 S.E.2d 877, 883 (Ct. App. 2009) (same) (citation omitted); *State v. White*, 372 S.C. 364, 372-73, 642 S.E.2d 607, 611 (Ct. App. 2007) (same) (citations omitted), *aff'd but criticized*, 382 S.C. 265, 676 S.E.2d 684 (2009); *State v. Douglas*, 367 S.C. 498, 508, 626 S.E.2d 59, 64 (Ct. App. 2006) (same) (citations omitted), *aff'd in part, rev'd in part*, 380 S.C. 499, 671 S.E.2d 606 (2009); *McDill v. Mark's Auto Sales, Inc.*, 367 S.C. 486, 490, 626 S.E.2d 52, 55 (Ct. App. 2006) (same) (citation omitted); *Ellis v. Davidson*, 358 S.C. 509, 525, 595 S.E.2d 817, 825 (Ct. App. 2004) (same) (citations omitted). This line of cases goes back to *Means*, which cited no South Carolina authority for the point but relied on a case from Colorado. *Means*, 348 S.C. at 166, 558 S.E.2d at 924. Today we reject the *Means* explanation of what is outside of a trial court's discretion. While an "arbitrary" or "unreasonable" ruling clearly is outside of a court's discretion, an "unfair" ruling may or may not be. Thus, we overrule *Cope*, *Fields*, *Ray*, *Simpson*, *Jones*, *Duncan*, *White*, *Douglas*, *McDill*, *Ellis*, *Grubbs*, and *Means* to the extent they use the *Means* definition of an abuse of discretion.

397 (2023). As we explained in *Morris*, if the record reflects the trial court "exercise[ed] its discretion according to law," we will almost always affirm the ruling. *Morris*, 438 S.C. at 585-86, 885 S.E.2d at 396; *see also State v. Gibbs*, 438 S.C. 542, 551-53, 885 S.E.2d 378, 383-84 (2023) (discussing in detail a trial court's exercise of discretion in ruling on the admissibility of evidence); *State v. Herrera*, 425 S.C. 558, 562, 823 S.E.2d 923, 925 (2019) (although the witness's "qualifications as an expert present a close question, under our deferential standard of review, we find no abuse of discretion in qualifying him as an expert"); *Phillips*, 430 S.C. at 340-41, 844 S.E.2d at 662 (reversing a trial court's ruling to admit expert testimony when the trial court did not "meaningfully exercise that discretion" and "we are actually conducting the analysis for the first time"); *Hamrick v. State*, 426 S.C. 638, 648-49, 828 S.E.2d 596, 601 (2019) (holding the trial court erred because it "failed to make the necessary findings that the State established the foundation required by Rule 702"). As we will explain, the trial court in this case thoughtfully applied a sound view of Rule 702 to the facts and circumstances involved in Hightower's testimony.

## III. Analysis

Wallace argues Hightower was not qualified to testify as an expert in the analysis of CSLI. Rule 702 of the South Carolina Rules of Evidence provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." To admit expert testimony under Rule 702, the proponent—in this case the State—must demonstrate, and the trial court must find, the existence of three elements: "the evidence will assist the trier of fact, the expert witness is qualified, and the underlying science is reliable." *Council*, 335 S.C. at 20, 515 S.E.2d at 518. In this case we are concerned with only the second *Council* element: whether "the expert witness is qualified."[4] *Id.* (referring to the statement "a witness qualified as an expert by knowledge, skill, experience, training, or education" in Rule 702).

---

[4] For a thoughtful discussion of the third *Council* element—"the underlying science is reliable"—in the context of CSLI, see *State v. Warner*, 430 S.C. 76, 83-89, 842 S.E.2d 361, 364-67 (Ct. App. 2020), *aff'd in part and remanded on other grounds*, 436 S.C. 395, 872 S.E.2d 638 (2022).

We begin by addressing an undercurrent in Wallace's arguments that the fact Hightower was employed by the prosecutor in the case renders him unqualified under Rule 702. This fact is certainly important, and trial counsel for Wallace stressed in her closing argument to the jury that Hightower "works for the prosecution." We have no doubt the jury considered this potential bias in determining whether to believe Hightower's testimony. This fact, however, does not relate to whether Hightower was "qualified" under Rule 702. In some other case under other circumstances, perhaps the objecting party may convince the trial court that similar bias is important in analyzing an expert witness's qualifications or the reliability of the underlying science. In this case, however, Hightower's potential bias was a credibility matter for the jury.

A trial court's analysis of whether an expert is qualified is affected by the complexity of the "scientific, technical, or . . . specialized knowledge" to which the witness will be called to testify. When expert testimony is scientific in nature, or when it is based on more complex technical or specialized knowledge, the witness providing the testimony will need a greater degree of "knowledge, skill, experience, training, or education" to be qualified. *Compare Hamrick*, 426 S.C. at 649, 828 S.E.2d at 602 (stating, "Accident reconstruction is a highly technical and specialized field in which experts employ principles of engineering, physics, and other knowledge," and noting attendance at a few classes was not sufficient "to satisfy the 'qualified as an expert' element of the Rule 702 foundation"), *with Herrera*, 425 S.C. at 563, 823 S.E.2d at 925 (finding a witness qualified to identify marijuana in bags—which "it does not appear that Herrera disputes"—based on nothing but his experience as a police officer). As a comparison between cases like *Hamrick* and *Herrera* indicates, on the other hand, when expert testimony is based on less complex knowledge, a trial court may find the degree of qualification required to satisfy the second element of Rule 702 is not as high. *See Maybank v. BB&T Corp.*, 416 S.C. 541, 567, 787 S.E.2d 498, 511 (2016) ("The test for qualification of an expert is a relative one that is dependent on the particular witness's reference to the subject." (quoting *Wilson v. Rivers*, 357 S.C. 447, 452, 593 S.E.2d 603, 605 (2004))).

In this case, Hightower testified about issues ranging from quite simple to fairly complex. For example, Hightower testified the phone number in question belonged to Wallace and explained what phone numbers the cell phone records showed Wallace's phone called that night. This testimony required a relatively low degree of expertise because it was based on mechanical interpretations of the information

in the call records.[5]  Hightower's more complex testimony, however, required a greater level of expertise.  Hightower created a map that showed the Greene Street house, the Pea Patch Road location, and four cell towers.  He explained to the jury which cell towers Wallace's phone connected to at what times on the night of the crimes.  He also explained the reasons a phone would connect to one cell tower as opposed to another and concluded that a phone at the Greene Street house would connect to the same tower and use the same "sector" he already stated Wallace's phone had connected to and used.

Our court of appeals has analyzed the testimony of CSLI experts in several cases.  In each of those cases, the witness provided expert testimony—using a methodology similar to Hightower's—that a defendant's phone traveled to and from a crime scene.  In each case, the expert the trial court found "qualified" had different levels of knowledge, skill, experience, training, and education.  In *Warner*, for example, the CSLI expert was an FBI special agent who had 800 hours of CSLI training; had been trained by all major cell carriers; and was an instructor to federal, state, and local agencies.  430 S.C. at 84, 842 S.E.2d at 364-65.  In *State v. Young*, 432 S.C. 535, 854 S.E.2d 615 (Ct. App. 2021), the court of appeals found a South Carolina Law Enforcement Division (SLED) expert "has the requisite knowledge, skill, experience, and training" because he "performed cell phone location analysis in over 200 cases[,] . . . was trained by the FBI's Cellular Analysis Survey Team[,] and received additional training from private entities."  432 S.C. at 543-44, 854 S.E.2d at 619.  In *State v. Franks*, 432 S.C. 58, 849 S.E.2d 580 (Ct. App. 2020), the court of appeals found a Sheriff's Office sergeant who used a software called "GeoTime" qualified as an expert because "he had fifteen years' experience working with call records and cell phone technology," went to "several" seminars about the software, and used it in "approximately fifty cases over . . . three or four years."  432 S.C. at 76, 849 S.E.2d at 590.

---

[5] Some courts treat relatively simple CSLI-based testimony as ordinary knowledge, not subject to Rule 702.  *See, e.g.*, *United States v. Graham*, 796 F.3d 332, 364 (4th Cir. 2015) (explaining the witness's "testimony that signal strength determines which cell tower will connect to a phone and that cell towers in urban areas have a two-mile maximum range of operability was not opinion testimony"), *vacated upon granting reh'g en banc on other grounds*, 824 F.3d 421 (4th Cir. 2016).  We respect the view of courts that have done so, but we find the better approach is to treat the interpretation of CSLI as technical or specialized knowledge, subject to Rule 702.

In this case, Hightower had fewer hours of training and years of experience than the FBI special agent in *Warner*, the SLED expert in *Young*, and perhaps the Sheriff's sergeant in *Franks*. However, the trial court conducted a robust pre-trial review of Hightower's qualifications and listened to a proffer of his testimony to determine whether he was nevertheless qualified. The court stated at the outset of the pre-trial hearing, "I . . . know what the science is," and then—speaking to the assistant solicitor—stated, "I just want to know what you're trying to get out of him at trial." The court asked "how close of a location or where [Hightower] put[s] . . . any of these people at any specific time, how close to a site?" The court was clearly attempting to gauge the complexity of the knowledge underlying Hightower's testimony, and specifically asked whether Hightower would "go into triangulation," a much more complex use of CSLI from which an expert might be able to determine the precise location of a phone, instead of simply determining the cell tower and sector the phone was using.[6] The assistant solicitor explained the State intended to have Hightower testify—not as to the precise location of Wallace's phone—but that Wallace's phone was connected to the tower near the Greene Street house, then connected to two towers near the Pea Patch Road location, and then connected back to the tower near Greene Street, at specified times on the night of the murder corresponding to when other evidence showed the kidnapping, murder, and disposal of Mony's body occurred.

Hightower then explained his training and education in CSLI which included: an internship with SLED; a four-week "on-the-job training" at the SLED Fusion Center, including training for basic knowledge of cell phone forensics and cellular analyses; a one-week "PenLink" call analysis training school at SLED about how to read and map cell phone records; a two-day course called "Fundamentals of Call Detail Records Analysis," which he testified taught him "how to read the records, how to map them, [and] an understanding of how sectors work"; another one-day training

---

[6] *See United States v. Beverly*, 943 F.3d 225, 230 n.2 (5th Cir. 2019) ("CSLI should not be confused with GPS data, which is far more precise location information derived by triangulation between the phone and various satellites."); *United States v. Smith*, No. 21-CR-30003-DWD, 2022 WL 17741100, at *3 (S.D. Ill. Dec. 16, 2022) (differentiating between the use of CSLI "to precisely determine the geographical location of a cell device and analyses that determine when a cell device connected to a particular cell site"); *In re Application of the U.S. for an Ord. for Prospective Cell Site Location Info. on a Certain Cellular Tel.*, 460 F. Supp. 2d 448, 451 (S.D.N.Y. 2006) (explaining "the long established process known as triangulation").

class on mobile forensics; a two-day class through the FBI "CAST" Unit on historical cell site analysis; and other courses. He explained these courses totaled at least seventy-two hours of training, and they included training by the FBI in the CASTViz program.[7] He testified these classes included "sector analysis," in which he learned the cell records will show which of three sectors of a cell tower a phone is using at any one time.[8] Finally, he testified he had analyzed at least 100 other sets of cell phone data, and taken continuing education. At one point the trial court interrupted his testimony to inquire "does someone then go in and check and test you and certify you for this tower information?" Hightower answered, "Yes," and explained the testing and his certification from the FBI CAST Unit for completing the "Cell Site Analysis Course." The trial court followed up, "So a one-week course, a two-week course, and then, at the end of the day, they test you to see if you do it correctly." The trial court continued to inquire, asking "So how many practicals can you do [during a one-week class and a two-day class]?"

The trial court then required Hightower to make "a full proffer" of his testimony because—she stated—her ruling would depend on "the science of it" and "how close he can get" to placing Wallace near the site of the murder and where the body was found. At various times during his proffer, the trial court interrupted him to ask questions, such as, "How can you get that specific? How can you get to 2.67?" On this point, Hightower explained the basis of his conclusion that one of the towers Wallace's phone connected to was 2.67 miles from the Pea Patch Road location.

After the proffer, the trial court again discussed with the attorneys the complexity of the testimony the State sought from Hightower. "So the State is asking that he be qualified as an expert in historical cell phone data, okay? That would allow him to just interpret what the cell phone records say. That doesn't allow him to testify to the location services." The trial court thus remained focused on understanding the complexity of Hightower's testimony, distinguishing between "the simple fact of just

---

[7] "CAST" is an abbreviation for the FBI's Cellular Analysis Survey Team, which specializes in cell phone record analysis. CASTViz is a software application developed by the FBI and provided to law enforcement agencies for visualization and basic analysis of cell phone records.

[8] Hightower explained each cell tower has three "sectors" that "encompass[] 120 degrees of coverage." He explained the CSLI indicates which sector the cell phone was using, which, in turn, indicates which direction—in relation to the cell tower—the phone was located.

extracting the data from the cell phones" and the more complex task of "tracking" the phone's exact location using "triangulation." The trial court stated, "I think [it is] really important exactly what [the testimony] is, because whatever he's qualified in, it only allows him to the extent he can testify."

From the trial court's "robust" examination of Hightower, this Court can clearly see the trial court understood and exercised its responsibility as gatekeeper. *See Phillips*, 430 S.C. at 334, 844 S.E.2d at 659 ("We have repeatedly enforced the requirement that trial courts exercise their gatekeeping responsibility in admitting expert testimony."). The court understood the second Rule 702 element "the expert witness is qualified," inquired deeply into the complexity of the witness's proposed testimony, thoroughly familiarized herself with the facts and circumstances of the case, came to a clear understanding of Hightower's intended testimony and the knowledge on which it was based, carefully thought through Wallace's objection to Hightower's qualifications, soundly applied the law, and articulated in detail her thought process in concluding that Hightower did possess the necessary qualifications to give the testimony he was being asked to give. This thorough analysis of the evidentiary objection before the court was, in fact, the "textbook" exercise of discretion.

## IV. Conclusion

We affirm the court of appeals and hold the trial court acted within its discretion by admitting Hightower's testimony because he was sufficiently qualified as an expert to testify about his analysis of Wallace's cell site location information.

**AFFIRMED.**

**BEATTY, C.J., KITTREDGE, JAMES, JJ., and Acting Justice Kaye G. Hearn, concur.**